The STATE of Ohio, Appellee,

v.

SMITH, Appellant.

[Cite as *State v. Smith*, 168 Ohio App.3d 141, 2006-Ohio-3720.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040778.

Decided July 21, 2006.

142

144

148

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Judith Anton Lapp, Assistant Prosecuting Attorney, for appellee.

Bryan R. Perkins, for appellant.

Per Curiam.

{¶ 1} On an evening in May 2001, defendant-appellant, Garey[1] Smith, shot and seriously injured Jeff King ("Dingo") on East 12th Street in the Pendleton area of Cincinnati's Over–the–Rhine district. Moments later, around the corner at Pendleton and East 13th Streets, Smith killed Jimmy Gordon and shot and seriously injured Andre Ridley and Steven "Bill" Franklin.

{¶ 2} Smith was indicted on one count of aggravated murder with specifications, three counts of attempted murder with specifications, six counts of felonious assault with specifications, and one count of having a weapon under a disability.

{¶ 3} At Smith's first trial, a jury acquitted him of the aggravated murder of Jimmy Gordon, but found him guilty of the lesser offense of murder. The jury also acquitted Smith of the attempted murder of Dingo, but found Smith guilty of the remaining counts and specifications. The trial court sentenced Smith to 47 years to life in prison.

{¶ 4} This court reversed Smith's convictions on appeal because the trial court had denied Smith's right to self-representation.[2] We also warned the prosecutor not to repeat misconduct in closing argument. On remand, the case was assigned to a new judge, and a date was set for retrial. Smith requested a continuance of this date, and the trial court granted the request. Forty-seven days before trial, Smith retained Bryan Perkins, his previously successful appellate counsel, as defense counsel. Perkins moved for a continuance. The trial court denied this request.

{¶ 5} At trial, the state proceeded on the theory that Smith had been in an "uncontrollable rage" and had sought vigilante justice. Smith claimed that he had acted in self-defense and also asked the court to instruct the jury on the inferior-degree offenses of voluntary manslaughter and aggravated assault, both

---

1. The indictment had the defendant's name as "Gary" rather than "Garey."

2. *State v. Smith,* 1st Dist. No. C–020610, 2004-Ohio-250, 2004 WL 102285.

of which contain the mitigating circumstance of "serious provocation." The trial court instructed the jury on self-defense, but it refused to give any "serious provocation" instructions. Thus, the jury was not instructed on the offense of aggravated assault and voluntary manslaughter.

{¶ 6} The jury was unable to agree on a verdict on the charges of murder and attempted murder, but it found Smith guilty of six counts of felonious assault with specifications and one count of having a weapon under a disability. The trial court imposed a prison term of 55½ years.

### Background Information

{¶ 7} Smith lived in a high-crime area of Cincinnati. He continually called the police to report drug dealing and loitering in and around his East 12th Street residence. On May 13, 2001, the night before the shootings, Smith called 911 to report that he had been robbed at gunpoint outside his home. On the 911 tape, Smith said that he was scared, and he sounded frightened. The 911 operator had to continually remind him to breathe. His testimony at trial about this event was consistent with what he reported on the tape: five black men had attacked him; several of the men took money from his pockets; and one of the men forced him to the ground, held a gun to his head, warned him that he was tired of Smith calling the police, and threatened to kill him if he continued to do so.

{¶ 8} Based upon Smith's description of his assailants, the police identified as suspects Jerry Tolbert, Nick Grant, and Kevin Grant. Nick Grant matched the description Smith had given of the gunman.

{¶ 9} The police believed that there had been an ongoing dispute between Smith and the suspects but found inconsistencies in Smith's story that he had been robbed. The officers interviewed the three suspects who had remained in the area but declined to charge any of them with robbing Smith at that point in the investigation. Nick Grant was arrested on an outstanding warrant, but he was released the next day. Tolbert and Kevin Grant were let out of police custody in front of Smith's home after a 43–year–old woman claiming to be the grandmother of 32–year–old Tolbert provided the men with an alibi.

{¶ 10} Smith testified that he was angry when the suspects were released. Two police officers investigating the crime testified that Smith was irate and emphatically stated, "I should just go get a gun and take care of this situation myself." Smith denied making this statement but did state that one of the officers told him either to stay indoors or to move.

{¶ 11} Smith further testified that after the police took Nick Grant to the Justice Center, Tolbert and Kevin Grant appeared outside his home, yelling that they would kill him if he prosecuted Nick. Smith testified that he called the police at District One to report the intimidation, but no one from the police followed up

on his call. Smith then retrieved his absent landlord's gun from his residence and test-fired it in the breezeway along the side of his building around midnight.

{¶ 12} The next morning, Smith drove to a hotel with the gun and checked in for two days. He contacted his real estate agent to follow up on a loan he had applied for to purchase a house in a different neighborhood. Carrying the gun, he returned to his home in the afternoon to pick up clothing and shoes he needed for his job as a welder. He parked several blocks away from his residence on East 12th Street and took a circuitous route on foot to return to his residence without being seen. When he approached his breezeway, a black SUV driven by Tolbert pulled up to him. Dingo and an unidentified man were passengers in the SUV. Tolbert warned Smith that if he prosecuted Nick Grant, "they" would kill him. Smith went inside and called 911. When Tolbert drove off, Smith returned to the hotel but forgot to bring with him his welder uniform.

{¶ 13} While driving back to the hotel, Smith turned on his car radio and heard local radio show host Pat Berry discussing crime and the police. Smith called into the show from a telephone at a gas station. He complained to Berry that the police were not doing their job in his neighborhood. Berry told him to move. Smith testified that he was angry and frustrated after this conversation. He returned to his hotel room, took a nap, and ate dinner.

### Smith's Testimony Concerning Dingo's Shooting

{¶ 14} Smith decided to go back to his home to retrieve the work shoes and jacket he had forgotten to retrieve after his run-in with Tolbert and Dingo. He parked his car several blocks away and took the circuitous route to his home. As he approached his residence, he claimed, he saw Dingo walking out of his breezeway and zipping up his pants after presumably urinating. Music was blaring from Dingo's car, which was parked in front of Smith's residence. Smith was angry and told Dingo that he was tired of "all you guys" using his house for a public toilet. He asked Dingo why he was always in his neighborhood and told him to go home. Dingo replied that his grandmother lived nearby. Smith told him to go home and to do his "stuff" where he lived. After telling Dingo that he had acquired a gun as a result of the robbery and threats, he showed him the gun, which was tucked into his waistband with the grip sticking out. He noticed Donald Nixon and Terry Britten down the street and told them that what he had said to Dingo also applied to them.

{¶ 15} After Smith turned around to investigate a noise, Dingo tried to grab the gun from him. Smith feared for his life and struggled with Dingo for control of the gun. Smith aimed the gun to the side of Dingo and fired, hoping to scare Dingo into letting go of the gun. Smith fired several more times after Dingo would not let go. Dingo pushed Smith back into a wall, turned, and ran west

along the street. As Smith's back hit the wall, the gun went off again. At some point during this altercation, Smith shot Dingo. Smith claimed he was unaware that a bullet had struck Dingo until the next day, when the shooting was reported by the news media.

{¶ 16} Smith then ran east on 12th Street, in the opposite direction from where Dingo had fled. Smith took the shortest route to his car, not the circuitous route, traveling east on 12th Street and north on the first perpendicular street, Pendleton Street. He held the burning-hot gun below his waist, and at the corner of East 12th and Pendleton Streets, he moved the slide back and forth to eject a casing. He claimed that he did not reload the gun.

### Smith's Testimony about Gordon's, Ridley's, and Franklin's Shootings

{¶ 17} Smith saw Nick Grant sitting on the top of a bench just beyond a store on Pendleton Street. He heard Grant say, "There that mother*ucker is, get him." Six or seven men, including Jimmy Gordon and Steve Franklin, were sitting on or standing around the bench. Gordon came up from the bench towards Smith and fired a revolver from about 15 feet away. Smith saw the flames of gunfire and heard the shot. Smith fired at Gordon when he saw Gordon getting ready to shoot again. After one shot, Gordon fell back. Smith then shot Steve Franklin in the leg because Franklin was coming towards him. Smith thought that Franklin was reaching for a weapon, but he never saw one. Franklin limped for a minute and then staggered just a few steps from Smith, and Smith shot him two more times. Franklin then fell over in the street between two parked cars. Smith turned around to find Andre Ridley approaching him from his left side with his hand on something in his pocket. Smith shot him, and Ridley went behind the store building.

{¶ 18} When Ridley left, Smith saw Nick Grant grab a man and hold the man in front of him as a shield while he moved back towards the store. Grant did not appear to have a gun, so Smith decided not to shoot at him. . Instead, he continued up Pendleton Street to the Liberty Street steps, which led him to his car. He returned to his hotel after deciding that it would not be wise to wait for the police to arrive because he was afraid of more aggressors, and he thought that the police might regard him as a threat if he stood in the street with his gun waiting for assistance.

{¶ 19} Smith returned to the hotel and turned himself in to the police two days later with the assistance of Pat Berry.

### The State's Testimony about Dingo's Shooting

{¶ 20} Dingo testified that he often visited his grandmother and his friends on East 12th Street. He knew of Smith but had never had any contact with him

until the evening of May 14, 2001, when Smith shot him. Just prior to his confrontation with Smith, Dingo had pulled up in front of the Pendleton Market, several doors down from Smith's residence. He was standing in front of his car and talking to Nixon and Britton, who were across the street drinking beer. Smith walked east on 12th Street, holding a gun in his hand. Dingo asked, "What's up?" Smith looked very angry and complained to Dingo about "all types of stuff he was tired of." Dingo denied any involvement in the "stuff." Smith pointed the gun at him and said he would kill him and the individuals across the street, so there would not be any witnesses. Dingo grabbed Smith's wrists and the two "tussled" for a short time. Dingo ran west on 12th Street after Smith regained control of the weapon. Smith fired at Dingo about six times and struck him with one bullet in the back. Dingo fell to the sidewalk and no longer saw Smith. Dingo heard more shots fired around the corner about a minute later.

{¶ 21} Dingo also testified that he had been convicted of several crimes of dishonesty as well as several felonies, including drug trafficking in 2000 and 1994.

{¶ 22} The state established that Donald Nixon and Terry Britton were both no longer available to testify. The prosecution read to the jury their testimony from Smith's first trial. Both men testified that they had been sitting near the park at East 12th Street and Spring Street and waiting to have a drink with Dingo when Smith arrived. Both testified that Smith was very angry and made accusations against Dingo, informing him that he was tired of all the "stupid shit" from people who did not live in the neighborhood. Both testified that Smith had threatened to kill Dingo and them.

{¶ 23} Nixon testified that he saw Dingo's grab for Smith's gun and the ensuing struggle. He turned and ran before any shots were fired.

{¶ 24} Britton testified that he saw Smith approach Dingo with the gun in his waistband. But he did not see the struggle between Smith and Dingo, and he did not see Smith shoot Dingo. When Smith had threatened him and Nixon, he fled to a hidden spot behind a wall. After hearing shots, Britton looked over the wall and saw Smith reload the magazine of his 9mm weapon before he started walking. On cross-examination, Britton admitted he had told the police on the night of the shooting that he had not seen Smith reload his magazine.

{¶ 25} Both Nixon and Britton admitted to having felony convictions within the past ten years, as well as convictions for crimes of dishonesty.

{¶ 26} Mary Barnes, Dingo's "cousin" who lived at East 12th Street and Broadway, testified that Dingo had often been present at East 12th and Spring Streets. She was home during the shooting. She did not see Dingo get shot, but she claimed that after hearing gun shots, she heard Smith say, "I shot him, I shot Dingo." Smith denied making this statement and claimed that he did not know

that Dingo had been shot until later. Barnes admitted on cross-examination that her apartment was located beyond the crime scene.[3]

### The State's Testimony about Gordon's, Ridley's, and Franklin's Shootings

{¶ 27} The state presented eyewitness testimony from Lucretia Williams, Ridley, Franklin, and Darryl McGee concerning the shootings on Pendleton Street. All of these witnesses testified that no one fired at or rushed Smith. The witnesses gave different testimony as to the exact location of Gordon when he was shot, but all four testified that Gordon was in front of the store, and not, as Smith had testified, beyond the store near a park bench.

{¶ 28} Lucretia Williams lived in an apartment building on the southwest corner of Pendleton and East 13th Streets, at a diagonal from the store. After hearing what she thought were firecrackers, Williams looked out her window facing the store. She saw a man run around the corner and at some point enter the store. She saw another man walk around the corner from East 12th Street to Pendleton Street with a gun held low in his right hand. The man crossed East 13th Street and began shooting at four or five men who were standing in front of the store. After the shooting began, several men ran around the store, and one ran up East 13th Street. She did not see anyone fire back. The shooter walked up Pendleton Street to the Liberty Street steps. A few of the shooting victims came limping back around to Pendleton Street. She did not hear any words prior to the shootings.

{¶ 29} Andre Ridley testified that he was visiting friends in the Pendleton area of Over–the–Rhine on May 14, 2001. He had no contact with Smith in the days prior to the shooting because he had been incarcerated in the Hamilton County Justice Center until the early morning of May 14, 2001. At around 10 p.m., he met Bill Franklin in front of the store to pay back money he had borrowed to post bond. Jimmy Gordon, Darryl McGee, and a few other men were also standing around the front of the store closer to the intersection.

{¶ 30} About 20 minutes later, he heard what he thought were firecrackers exploding. Nick Grant came up to Gordon and said a few things about Smith. In response, Gordon said, "I ain't got nothing to do with that shit around the corner," and he threw a few punches. Then he heard Nick Grant say, "Here he come." Ridley saw Smith approach and saw Nick Grant go into the store. Ridley testified that he did not think Smith was a threat and looked away. When he looked back, he saw Smith take a gun from his pants and fire in Gordon's direction. Gordon had his back against the wall of the store building. He did not

---

3. The State's Exhibit 2, a diagram of the crime scene area, is missing from the appellate record.

see Gordon reach for anything in his pockets. Ridley heard two or three shots, and he and Franklin ran around the corner of the store building. After he and Franklin ran into each other and fell, Ridley realized that he had been shot in his abdomen, about three inches to the right of his midsection. Franklin was shot also. Franklin rose and said, "I'm hit, I'm hit!" Smith then shot at Franklin four more times. Ridley testified that no one on Pendleton Street had a gun except Smith. He also informed the jury that he had several felony convictions over the past ten years.

{¶ 31} Bill Franklin testified that he was spending time with Ridley, Gordon, Darryl McGee, and some other friends in front of the store on the evening of May 14, 2001. None of them had any weapons. When Franklin was talking to Ridley, Nick Grant walked up to the group and said, "You got to watch dude," before entering the store. Franklin saw Smith walking up from the same direction Nick Grant had come. He had never seen Smith before. Smith walked up with his hands in his pants, pulled out a gun, and shot Gordon, who was leaning against the telephone pole close to the intersection. After seeing the shooting, Franklin turned and ran around the corner of the store building, but he fell, and Smith shot him in his leg. When he got up, Smith shot him again in the chest and elbow.

{¶ 32} Franklin testified that he was shot as he was fleeing, but his medical records indicated that all of his bullet wounds were on the front of his body. He also testified that he did not spend time with Nick Grant and his family on East 12th Street, but on cross-examination, he admitted that he had fathered two children with Nick Grant's cousin. He also admitted that he had a recent felony conviction for drug possession.

{¶ 33} Darryl McGee, a close friend of Gordon, Ridley, and Franklin, testified that he was in the Pendleton area on May 14 waiting for Ridley to be released from the Justice Center. At about 10:30 p.m., he was talking to Gordon in front of the store, near where Ridley and Franklin were talking. Nick Grant and Giovanni Wright approached them. Grant "started playing with" Gordon, who was standing on the sidewalk near a stop sign in front of the store. McGee, leaning against the store building, heard Grant say, "You all need to get up out of here, dude is coming down the street." Gordon pushed Grant, and Grant went into the store. Wright also warned them to leave. Then Smith came up on the sidewalk, walked between McGee and Gordon, pulled a gun out of pants, and said, "I ain't got nothing else to live for," before shooting Gordon. McGee heard two more shots and then fled down East 13th Street.

{¶ 34} McGee admitted that he had several felony convictions over the past ten years for robbery, theft, and receiving stolen property, and that he was on postrelease control at the time of his testimony. On cross-examination, he

acknowledged that he did not contact the police or prosecutor until 14 months after the shooting, and that he lived in the same building as state's witness Lucretia Williams.

## The Police Investigation of the Shootings

{¶ 35} The police investigating the crime scene did not find any firearms on any of the shooting victims. But Michael Trimpe, a trace-evidence examiner at the Hamilton County Coroner's crime lab, testified that Gordon's right hand contained particles of primer residue consistent with either firing a weapon or being close to a weapon as it was fired. Trimpe found no particles of primer residue on Dingo's hands. Trimpe did not test the hands of Ridley and Franklin.

{¶ 36} Cincinnati police crime-scene examiner Ronald Camden was called to the scene of the shootings at 2:30 a.m. on May 15. With the assistance of three other crime-scene examiners, he examined the large crime-scene area and found 23 spent casings. Camden found seven spent casings on the sidewalk in front of the Pendleton Market at 418 East 12th Street and the building immediately east of the market. He testified that Dingo was shot in this area. Further to the east, at 422 East 12th Street, Camden found a live cartridge on the sidewalk. In the breezeway of Smith's apartment building, located at 426 East 12th Street, Camden found several more spent casings, apparently from when Smith had test-fired the gun. Camden found six more casings on Pendleton Street near the intersection of East 13th Street, where Gordon, Ridley and Franklin had been shot.

{¶ 37} Based upon his experience of firing a 9mm pistol for ten years at the shooting range, Camden testified that the shooter was standing five to ten feet from where the spent casings were found when he fired at the men. Camden's testimony concerning the location of the shooter corroborated the state's witnesses' location testimony and contradicted Smith's testimony that he was in front of his house when he shot Dingo and that he was past the store when he shot the other men. But Camden admitted on cross-examination that the casings could have rolled down the 12th Street and Pendleton Street inclines or could have been kicked prior to the police securing the area.

{¶ 38} Further, Camden testified that he did not find any blood or bullet marks on the front outside wall of the store that would have indicated that Gordon was standing up against the store when he was shot, as Ridley had testified.

{¶ 39} Robert Michael Lenhoff, a firearms examiner for the Hamilton County Coroner's crime lab, testified as a firearms expert for the state. He stated that all the discharged casings found were fired from the same 9mm semiautomatic pistol. Smith did not dispute that this weapon was the one that he had carried.

{¶ 40} The live ammunition that the police found in Smith's home and in front of 422 East 12th Street was consistent in design with the spent ammunition found at the crime scenes, although there were no markings to indicate that Smith had cycled these cartridges through his 9mm weapon.

{¶ 41} On cross-examination, Lenhoff was asked whether the police would have found any spent casings if Gordon had shot at Smith with a revolver. Lenhoff testified that a revolver did not discharge the spent casing like a semiautomatic pistol. Rather, the spent casing remained in the revolver's chamber and would not have been expelled onto the ground. Therefore, if Gordon had shot at Smith with a revolver, the casing would have remained in the revolver.

## Smith's Assignments of Error

{¶ 42} In this appeal, Smith's appellate counsel has raised seven assignments of error for our review and has forwarded an additional five assignments of error raised by Smith on his own behalf.

## Aggravated–Assault Instruction

{¶ 43} In his first assignment of error, Smith challenges the trial court's refusal to instruct the jury on the offense of aggravated assault for the shootings of Dingo, Ridley, and Franklin.

{¶ 44} The elements of aggravated assault are identical to the elements defining felonious assault, except for the additional mitigating element of serious provocation.[4] Therefore, aggravated assault is an inferior-degree offense of felonious assault.[5] The provocation mitigates the crime, rendering the provoked defendant less worthy of blame and subject to less punishment.[6]

{¶ 45} The serious-provocation element of aggravated assault is statutorily defined as acting "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force."[7] Black's Law Dictionary defines the emotions demonstrating sudden passion as "rage, terror, or furious hatred."[8]

---

4. See *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, at paragraph four of the syllabus.

5. Id. at paragraph two of the syllabus.

6. See *State v. Shane* (1992), 63 Ohio St.3d 630, 635, 590 N.E.2d 272.

7. R.C. 2903.12(A).

8. Black's Law Dictionary (7th Ed.1999) 726 (definition of "heat of passion").

{¶ 46} The serious-provocation inquiry is a factual inquiry that contains "both objective and subjective components." [9] The provocation "must be sufficient to arouse the passions of an ordinary person beyond the power of his * * * control," [10] so that at that moment, he is " 'directed by passion rather than by reason.' " [11] In measuring the adequacy of the provocation, this objective standard does not take into account an individual characteristic of a defendant such as short-temperedness.

{¶ 47} Next, if the provocation was objectively reasonable, then the factfinder's inquiry shifts to whether the defendant was in fact under a sudden passion or in a sudden fit of rage when he committed the crime. [12] During this subjective inquiry, the factfinder must consider evidence of "the ' * * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at that time.' " [13]

{¶ 48} Further, under the statute, the victim must cause the serious provocation, and the defendant must react suddenly. Past altercations and past verbal threats do not satisfy the test for sufficient provocation where there is sufficient time for cooling off. [14] Likewise, fear without other factors is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage. [15] Importantly, "[w]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." [16]

{¶ 49} Before instructing the jury on serious provocation in a trial for felonious assault, the trial court must determine as a matter of law whether evidence of sufficient provocation occasioned by the victim has been presented to warrant the instruction. [17] When a defendant has requested the instruction, the evidence must be such that a jury could find serious provocation by a preponder-

9. *Shane,* 63 Ohio St.3d at 634, 590 N.E.2d 272.

10. *Shane,* 63 Ohio St.3d at 635, 590 N.E.2d 272.

11. Black's Law Dictionary (7th Ed.1999) 726 (definition of "heat of passion"), citing Perkins & Boyce, Criminal Law (3d Ed.1982) 99.

12. *Shane,* 63 Ohio St.3d at 634, 590 N.E.2d 272.

13. Id., quoting *State v. Deem,* supra, at paragraph five of the syllabus.

14. *State v. Mack* (1998), 82 Ohio St.3d 198, 201, 694 N.E.2d 1328.

15. Id.

16. *Shane,* 63 Ohio St.3d 630, 590 N.E.2d 272, at paragraph two of the syllabus.

17. Id. at 637, 590 N.E.2d 272.

ance of the evidence.[18] This evidence can be drawn from both the state's and the defendant's cases.[19]

{¶ 50} The test for giving an instruction on an inferior-degree offense is similar to the test applied when an instruction on a lesser included offense is sought.[20] Thus, if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant guilty of the inferior-degree offense and to acquit on the greater offense because of the provocation, the instruction on the inferior-degree offense should be given.[21] In making this determination, the court must construe all the evidence in the light most favorable to the defendant.[22]

{¶ 51} The ultimate persuasiveness of the evidence regarding the provocation is irrelevant.[23] Only when a court finds as a matter of law that no reasonable jury could find that the provocation was adequate and actual may the court refuse to give a requested instruction on provocation.[24]

### Dingo's Shooting

{¶ 52} The state proceeded on the theory that Smith was in an "uncontrollable rage" even before he approached Dingo and that this rage was not created by the provocation required for the mitigation of the crime. We agree with the state that the events occurring earlier in the day of Dingo's shooting and on the days prior were not enough, as a matter of law, to establish the serious and sudden provocation required for the provocation instruction, because Smith had time to cool off from these events, and Dingo was not involved in the robbery.

{¶ 53} But Smith did not fire the gun without other events occurring. We hold that a reasonable juror, construing the facts in the light most favorable to Smith, could have found by a preponderance of the evidence that Smith was provoked.

---

18. R.C. 2901.05(A).

19. See *State v. Hill* (1996), 108 Ohio App.3d 279, 670 N.E.2d 555.

20. See *Deem*, 40 Ohio St.3d at 211, 533 N.E.2d 294; *Hill*, 108 Ohio App.3d at 283, 670 N.E.2d 555.

21. See *Deem*, 40 Ohio St.3d at 211, 533 N.E.2d 294.

22. See *State v. Rhodes* (1992), 63 Ohio St.3d 613, 617–618, 590 N.E.2d 261; *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388, 18 O.O.3d 528, 415 N.E.2d 303.

23. See id. at 388, 415 N.E.2d 303.

24. *Deem*, 40 Ohio St.3d at 211, 533 N.E.2d 294; *Shane*, 63 Ohio St.3d at 634–635, 590 N.E.2d 272.

{¶ 54} Smith returned home late in the evening on May 14 only to find Dingo urinating in his yard and loudly playing his car radio. Dingo had been with Tolbert earlier in the day when Tolbert warned Smith that "they" would kill him.

{¶ 55} When confronted by Smith, Dingo confirmed that he did not live in the area, although his grandmother did. When Smith showed him the gun in his waistband to scare off Dingo and his friends, Dingo grabbed it. Smith did not have time to cool off because Dingo was shot in the ensuing struggle over control of the gun. These facts met the objective standard for sudden provocation.

{¶ 56} Further, the record contains evidence that Smith was actually provoked into a sudden passion or rage when he fired the gun. Dingo testified that Smith looked "angry and upset" and "drunk or something." Britton testified that Smith proclaimed, "I'm tired of all you mother*uckers. I'm tired of your stupid shit." Nixon described Smith's conversation with Dingo as an "outburst."

{¶ 57} Although Smith testified that he was not in an uncontrollable rage when he spoke to Dingo, the jury could reasonably have inferred sudden passion or sudden fit of rage based upon the tenor of Smith's testimony, which indicated that his anger escalated into "rage, terror, or furious hatred." Smith testified about how he felt during the altercation: Dingo had urinated in the breezeway, and Smith testified, "[He] got his car door open and music blasting. * * * I'm just saying man, I have to live in a hotel, and this guy over here doing this kind of stuff. I told him he should go where he live and do that kind of stuff. I mentioned the thing about his friend who had robbed me and threatened me the day before, and kept–he, like, he was with them earlier that day when they had threatened me. I'm like, I got a gun. I showed him I had a gun stuck down in my waistband. I got a gun, you guys keep coming down here talking about killing people. You guys ain't the only ones with a gun." At this point, Smith turned and Dingo grabbed the gun from his waistband with two hands. Smith thought Dingo would harm him if he got the gun because Smith was not holding him and Dingo could have just walked away. The struggle over the gun lasted less than a minute. Smith admitted he intentionally shot the gun in the air to scare off Dingo. He was not sure when Dingo was shot but thought that contact occurred only after Dingo had pushed him into the wall, causing the gun to discharge.

{¶ 58} Construing these facts in Smith's favor, a reasonable juror could have found that Smith became more and more upset as the conversation continued, that when Dingo grabbed the gun, Smith was provoked to "rage, terror, or furious hatred," and that he shot Dingo out of passion rather than out of reason.

{¶ 59} We are mindful that courts are reluctant to give an aggravated-assault instruction and a self-defense instruction in a prosecution for felonious assault. But as in this case, where the record contains evidence from which a reasonable

juror could find provocation and reject self-defense, the court must give the provocation instruction.[25]

{¶ 60} On remand, the jury will have to decide whether Smith returned to his home in a revenge-seeking rage, pointed his gun at Dingo, and fired, as the state claimed, or whether Smith shot Dingo in self-defense or because he was suddenly provoked.

### Ridley's and Franklin's Shootings

{¶ 61} After his struggle with Dingo, Smith feared that Dingo's "buddies" would come back to harm him. When he approached the store on Pendleton Street moments later, he claimed, Nick Grant, who had threatened him at gunpoint the night before, had ordered everyone standing around to get him. More importantly, he claimed that Gordon had fired at him and that Ridley and Franklin, possibly armed, rushed towards him before he shot them.

{¶ 62} Arguably Ridley's and Frankin's actions under these circumstances had the potential to provoke an objectively reasonable person into a sudden fit of passion or rage that was sufficient to incite the use of deadly force.

{¶ 63} But the record does not contain any evidence that Smith was actually provoked when he shot Gordon, Ridley, and Franklin. No witnesses testified that Smith looked angry or as if he were in a rage at this point. McGee testified that Smith exclaimed prior to firing at the men, "[F]* * *, I ain't got nothing else to live for." Importantly, Smith repeatedly claimed that he fired at the men only because he feared for his life. Further, he testified that he could have shot Nick Grant, who had terrorized him in the past, but chose not to do so because Grant was not armed or coming towards him.

{¶ 64} In sum, the record does not contain evidence from which a reasonable juror could have found that Smith was, in fact, acting under sudden passion or rage when he shot at the men on Pendleton Street.[26]

{¶ 65} Accordingly, the trial court erred in not allowing the jury to consider the inferior-degree offense of aggravated assault where there was evidence that Smith was sufficiently provoked when he shot Dingo. Conversely, where there was no evidence that Smith was sufficiently provoked when he shot Ridley and Franklin, the trial court's refusal to allow the jury to consider the lesser degree offense of aggravated assault was not in error. The assignment of error is

---

**25.** See *State v. Ervin* (1991), 75 Ohio App.3d 275, 279, 599 N.E.2d 366; *State v. Hill*, 108 Ohio App.3d at 283, 670 N.E.2d 555; *State v. Owens*, 5th Dist. No.2004–CA–87, 2005-Ohio-4402, 2005 WL 2045282, at ¶ 31; *Ohio v. Mitchell–Dulaney* (Dec. 21, 2000), 10th Dist. No. 00AP–542.

**26.** *State v. Levett*, 1st Dist. No. C–040537, 2006-Ohio-2222, 2006 WL 1191851, at ¶ 29.

sustained in part and overruled in part. Smith is entitled to a new trial on counts five and six of the indictment.

{¶ 66} We now address the remaining assignment of errors as they pertain to Smith's convictions on the counts other than five and six.

## Continuance Denial

{¶ 67} In his second assignment of error, Smith argues that the trial court erred in denying his request to continue his trial when defense counsel had been retained only 49 days before the trial date.

{¶ 68} "The grant or denial of a continuance is entrusted to the broad, sound discretion of the trial judge. Several factors can be considered: the length of the delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors." [27] Ultimately, the circumstances must not indicate that the court's decision was arbitrary, in violation of the defendant's due-process rights.[28]

{¶ 69} In January 2004, defense counsel Brian Perkins was successful in appealing Smith's convictions from his first trial, because the trial court had denied Smith his right to self-representation. On remand, the trial court set a July 2004 retrial date and appointed William Welsh and later Charles Isaly to assist Smith with his pro se representation.

{¶ 70} In May 2004, Smith requested a continuance of the trial date. The court granted the continuance and set the case for a retrial on October 4, 2004. Forty-nine days before the trial date, in August 2004, Smith again retained Brian Perkins as defense counsel. Perkins moved for a 60–day continuance, primarily to give himself more time to prepare for trial and to secure a different ballistics expert.

{¶ 71} The court held a hearing and found that a continuance was not warranted because the state was not presenting any new witnesses or evidence. The court cited the fact that a prior continuance had been granted; that defense counsel was intimately familiar with the case due to his appellate representation; that the continuance would be an inconvenience to the court and the witnesses; and that the defendant had contributed to the circumstances that had given rise to the request for the continuance.

{¶ 72} We find the trial court's reasoning for denying the request sound. Further, the record indicates that defense counsel was prepared for trial and

---

27. (Citation omitted.) *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710.

28. *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 423 N.E.2d 1078.

zealously represented Smith. Accordingly, we hold that the trial court did not abuse its discretion in denying Smith's motion for a continuance.[29] The second assignment of error is overruled.

## Double Jeopardy

{¶ 73} In his third assignment of error, Smith argues that the multiple prosecutions and punishments for the same offenses placed him in jeopardy twice, violating his rights under the federal and state constitutions.

{¶ 74} The United States Constitution and the Ohio Constitution provide similar double-jeopardy protections that "guard citizens against both successive prosecutions and cumulative punishments for the 'same offense.'"[30] We first address Smith's argument that the state violated the "successive prosecution" prong of the Double Jeopardy Clause.

## Successive Prosecution

{¶ 75} A defendant's double-jeopardy rights are not violated under the successive-prosecution prong when he is retried after a reversal and re-mand,[31] as long as the appellate court did not reverse on the basis of insufficient evidence.[32] Thus, we reject Smith's argument that the Double Jeopardy Clause prevented the state from retrying him because his convictions were reversed on appeal. Likewise, we reject Smith's argument that he could not have been retried on some of the felonious-assault charges because the original judge had merged those offenses into other convictions for purposes of sentencing. Where, as here, an appellate court awards a new trial on the basis that the defendant was denied the right to represent himself, the defendant stands accused as if there had been no previous trial.[33] Smith was never acquitted of those crimes, so he could be retried for those offenses.

## Cumulative Punishment

{¶ 76} Next we address Smith's argument that the state violated the "cumulative punishment" prong of the Double Jeopardy Clause. This prong prevents the sentencing court from imposing a greater punishment than the

---

29. *Landrum*, 53 Ohio St.3d at 115–116, 559 N.E.2d 710,

30. *State v. Rance* (1999), 85 Ohio St.3d 632, 634, 710 N.E.2d 699.

31. See *State v. Liberatore* (1982), 69 Ohio St.2d 583, 591, 23 O.O.3d 489, 433 N.E.2d 561.

32. See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

33. See *Liberatore*, 69 Ohio St.2d at 591, 23 O.O.3d 489, 433 N.E.2d 561.

General Assembly intended.[34] The General Assembly, in promulgating Ohio's multiple-count statute,[35] has expressed its intent to allow cumulative sentencing for the commission of certain crimes, including offenses of dissimilar import.[36] The Ohio Supreme Court has held that two offenses stemming from the same criminal act are offenses of dissimilar import when the elements of the two offenses, compared in the abstract, do not correspond to such a degree that the commission of one offense will result in the commission of the other.[37]

{¶ 77} For each nonfatal shooting, Smith was convicted and sentenced to consecutive eight-year terms on one count of felonious assault in violation of R.C. 2903.11(A)(1) and one count of felonious assault in violation of R.C. 2903.11(A)(2). This court has already held that felonious assault under R.C. 2903.11(A)(1), which involves causing serious physical harm to another, and felonious assault under R.C. 2903.11(A)(2), which involves causing or attempting to cause physical harm to another by means of a deadly weapon or dangerous ordnance, are offenses of dissimilar import when the elements are compared in the abstract.[38] Therefore, Smith's double-jeopardy rights were not violated because the General Assembly has provided that Smith could be sentenced to separate, cumulative sentences for each felonious assault, even though both violations stemmed from a single criminal act.

{¶ 78} Finally, Smith argues that the cumulative-punishment prong of the Double Jeopardy Clause prevented the trial court from imposing a harsher sentence after his reconviction. He contends that his sentence after retrial was more harsh because the court imposed consecutive terms of imprisonment instead of merging the convictions, as the original sentencing court did.

{¶ 79} Smith was originally sentenced to a prison term of 47 years to life after being found guilty of one count of murdering Gordon, two counts of feloniously assaulting Dingo, one count of attempting to murder Ridley, two counts of feloniously assaulting Ridley, one count of attempting to murder Franklin, two counts of feloniously assaulting Franklin, one count of having a weapon under a disability, and all the related specifications. The original sentencing judge did

---

34. See *Rance*, 85 Ohio St.3d at 635, 710 N.E.2d 699, quoting *Missouri v. Hunter* (1983), 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535.

35. R.C. 2941.25(B).

36. See *Rance*, 85 Ohio St.3d at 635–636, 710 N.E.2d 699.

37. See *Rance*, 85 Ohio St.3d at 638, 710 N.E.2d 699.

38. See *State v. Smith*, 1st Dist. No. C–040348, 2005-Ohio-1325, 2005 WL 678532, at ¶ 20, citing *State v. Coach* (May 5, 2000), 1st Dist. No. C–990349, 2000 WL 543801.

not impose separate punishments for five of the felonious assaults because it erroneously found that separate punishments were precluded by law. But the judge imposed maximum terms on the remaining convictions, including an eight-year term for the felonious assault of Dingo, and the judge ordered that Smith serve all the terms consecutively. After a successful appeal and retrial, in which he was only found guilty of six counts of felonious assault with specifications and one count of having a weapon under a disability, Smith was sentenced to 55½ years in prison.

{¶ 80} We agree that Smith received a harsher sentence for the felonious-assault convictions after retrial. But this sentence did not violate the "cumulative punishment" prong of the Double Jeopardy Clause.

{¶ 81} The "cumulative punishment" prong of the Double Jeopardy Clause prohibits only multiple punishments for the same offense.[39] This proscription is not violated even when a defendant receives a harsher sentence after reconviction, so long as the "punishment already exacted" is "fully 'credited' in imposing sentence upon a new conviction for the same offense."[40] In this case, the trial court credited Smith for the prison time he had served after his first trial.

{¶ 82} Smith has presented no Double Jeopardy Clause violations. Accordingly, we overrule the third assignment of error.

### Due Process

{¶ 83} In his first argument under the fourth assignment of error, Smith raises the related issue of whether the trial court violated his due-process rights when it imposed a harsher sentence for the felonious-assault convictions after retrial.

{¶ 84} After a retrial, the trial court may sentence a defendant to any term authorized by law.[41] But the Due Process Clause prevents the trial court from vindictively sentencing a defendant to a harsher sentence after retrial to punish the defendant for the successful appeal.[42] Vindictiveness may be pre-

---

39. See *North Carolina v. Pearce* (1969), 395 U.S. 711, 716–721, 89 S.Ct. 2072, 23 L.Ed.2d 656, limited on other grounds, *Alabama v. Smith* (1989), 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865.

40. Id. at 718–719, 89 S.Ct. 2072, 23 L.Ed.2d 656,

41. See *Chaffin v. Stynchcombe* (1973), 412 U.S. 17, 25, 93 S.Ct. 1977, 36 L.Ed.2d 714.

42. Id.; see, also, *Alabama v. Smith*, 490 U.S. at 798, 109 S.Ct. 2201, 104 L.Ed.2d 865, citing *North Carolina v. Pearce* (1969), 395 U.S. 711, 723–725, 89 S.Ct. 2072, 23 L.Ed.2d 656.

sumed where "there is a 'reasonable likelihood' that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." [43]

{¶ 85} Where a different judge imposes a harsher sentence after an independent assessment, there is no true "increase" in the sentence, and the vindictiveness presumption does not apply.[44] The presumption does not apply in this case because Smith was resentenced by a different judge.

{¶ 86} Where the presumption does not apply, the defendant must demonstrate vindictiveness from the record.[45] But Smith has failed to point to any evidence that the trial court was motivated by vindictiveness in imposing a harsher sentence.

{¶ 87} Our review indicates that both sentencing judges found the maximum eight-year term of incarceration appropriate for the felonious-assault convictions, but the first sentencing judge merged some of the counts because he erroneously found that separate punishments were precluded by law. After retrial, the new judge recognized that there was no legal impediment to separate, consecutive terms for the felonious-assault convictions. Thus, this record demonstrates leniency by the original sentencing judge due to an error of law, and not a harsher sentence due to the vindictiveness of the second sentencing judge.

{¶ 88} Further, the record indicates that the second judge based Smith's new sentence upon the statutory sentencing framework applicable at the time. The court considered Smith's many prior convictions and the facts of the underlying case in determining that maximum, consecutive sentences were warranted.

{¶ 89} In sum, we find no evidence that the trial court imposed a harsher sentence after retrial to punish Smith for a successful appeal. Thus, the sentence did not deprive Smith of due process.

### Sixth Amendment Violations During Sentencing

{¶ 90} In the fourth assignment of error, Smith additionally challenges the constitutionality of the factual findings made by the trial court in imposing consecutive terms. Similarly, in his fifth assignment of error, he challenges the constitutionality of the factual findings made by the trial court in imposing maximum terms. We find merit in these arguments based upon the Ohio

---

43. (Citation omitted.) *Alabama v. Smith*, 490 U.S. at 799, 109 S.Ct. 2201, 104 L.Ed.2d 865.

44. See *Texas v. McCullough* (1986), 475 U.S. 134, 140, 106 S.Ct. 976, 89 L.Ed.2d 104. See, also, *State v. Gonzales*, 151 Ohio App.3d 160, 2002-Ohio-4937, 783 N.E.2d 903, at ¶ 65; *State v. Johnson*, 2nd Dist. No. 18937, 2002-Ohio-4339, 2002 WL 1941162, at ¶ 13–19.

45. See *Alabama v. Smith*, 490 U.S. at 799–800, 109 S.Ct. 2201, 104 L.Ed.2d 865; *Johnson*, 2002-Ohio-4339, at ¶ 21.

Supreme Court's decision in *State v. Foster*,[46] which struck down portions of Ohio's felony sentencing guidelines. *Foster* held that the findings made by the trial court in imposing both maximum and consecutive terms were an unconstitutional invasion of the defendant's Sixth Amendment jury-trial rights.[47]

{¶ 91} Accordingly, we sustain Smith's fourth assignment of error in part and his fifth assignment of error in its entirety. Smith received maximum, consecutive terms for the felonious assaults against Ridley and Franklin and for having a weapon under a disability. We vacate these sentences and remand the case for resentencing under the modified sentencing statutes.

## Manifest Weight of the Evidence

{¶ 92} In the sixth assignment of error, Smith argues that his felonious-assault convictions were against the manifest weight of the evidence. Because we have already vacated the felonious-assault convictions involving Dingo's shooting, we do not need to determine whether those two convictions were against the manifest weight of the evidence. Rather, we limit our review to whether Smith's convictions for the felonious assault of Ridley and Franklin were against the manifest weight of the evidence.

{¶ 93} A defendant challenging the weight of the evidence accepts that the state presented sufficient evidence of each element, but attacks the credibility of the evidence presented.[48] When evaluating a claim that a conviction was contrary to the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[49] The discretionary power to reverse should be invoked only in exceptional cases "in which the evidence weighs heavily against the conviction."[50]

{¶ 94} The jury was presented with two different accounts of how Ridley's and Franklin's shootings occurred. Ridley and Franklin testified that Smith approached the group on Pendleton Street and began firing at them. They testified that they were not armed, that they had never rushed Smith, and that they were

---

46. 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

47. Id. at paragraphs one and three of the syllabus.

48. See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

49. See id.; *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

50. *Martin*, supra.

running away from Smith when they were shot. Further, they testified that Nick Grant never ordered anyone to "get" Smith, that Gordon did not preemptively shoot Smith, and that Gordon did not possess a firearm. Their testimony was consistent with the testimony of McGee and Williams, as well as some of the physical evidence from the crime scene.

{¶ 95} Smith claims that the state's witnesses could not be believed because these witnesses were a "parade of criminals, thieves, drug dealers, and liars, who had strong motivation to paint Smith as the aggressor." But the jury was made aware of the biases and infirmities of the state's witnesses and chose to believe them.

{¶ 96} Further, the evidence in support of Smith's self-defense theory was not so convincing that we can say that the jury lost its way in not believing Smith. Smith was required to prove by a preponderance of the evidence that (1) he was not responsible for creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force; and (3) he did not violate any duty to retreat or to avoid the danger.[51] If the jury found that Smith had failed to prove by a preponderance of the evidence any one of the three elements, then it could not have found that Smith had acted in self-defense.[52] The jury could have rejected self-defense on several grounds, including rejecting the entirety of Smith's testimony that he was attacked.

{¶ 97} In support of his theory that he was attacked, Smith pointed to two key pieces of evidence: the primer residue found on Gordon's hand and the location of the bullet-entrance wounds on the victims. Smith claimed that Gordon's hand had primer on it because Gordon had fired a gun at him. But the police did not recover any other weapons, bullets, or spent casings from the area to bolster Smith's theory that Gordon had actually fired at him. And the ballistics expert testified that Gordon's hand could have tested positive for primer residue because Smith had shot him at close range.

{¶ 98} Smith claimed that the location of the victim's bullet wounds on the front of the victims' bodies demonstrated that the victims were not retreating when they were shot. Rather, he claims, the location of the bullet wounds demonstrated that they were charging him, consistent with his theory of self-defense. But by all the witnesses' accounts, including Smith's, the shootings began immediately after Smith reached the group. The location of Ridley's bullet wound about three inches to the right of his navel could have been harmonized with Ridley's

---

51. See *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 72.

52. Id. at ¶ 73.

testimony that he was trying to flee, if the jury believed that Ridley did not have time to fully turn his back to Smith. This same rationale could have explained the bullet-entrance wounds on the front side of Franklin's leg, chest, and elbow. Franklin even testified that he fell after he was shot in the leg, and that when he got up, he looked at Smith, and Smith fired at him again, striking his chest and elbow.

{¶ 99} The trier of fact is primarily responsible for judging the credibility of the witnesses, and the trier of fact has the advantage of viewing the witnesses as they testify.[53] The jury could have easily discredited Smith's testimony that he was attacked, because all of the other eyewitnesses' testimony contradicted his testimony and because, while testifying, Smith repeatedly and flagrantly violated the trial court's orders to refrain from improper personal attacks on the judge, the prosecutors, and the state's witnesses. Smith also blatantly ignored the court's orders to refrain from citing matters beyond the scope of the evidence. The jury witnessed Smith's purposeful disregard of the trial court's orders and was informed of Smith's prior felony convictions, which further undermined Smith's credibility.

{¶ 100} In light of the evidence presented, we decline to hold that the trier of fact lost its way in rejecting Smith's claim that he had a bona fide belief that he was in imminent danger of death or great bodily harm when he shot Ridley and Franklin. Accordingly, we overrule the sixth assignment of error.

## Prosecutorial Misconduct

{¶ 101} In his seventh assignment of error, Smith argues that prosecutorial misconduct during closing argument deprived him of his right to a fair trial.

{¶ 102} The prosecution is generally entitled to a "certain degree of latitude" in closing argument, but it must not attempt to obtain a conviction by going beyond the evidence that is before the jury.[54] The trial court in its discretion generally determines the propriety of closing arguments.[55]

{¶ 103} Where defense counsel has objected to improper remarks in closing argument, a conviction should be reversed if the improper remarks "prejudicially affected substantial rights of the defendant."[56] Thus, unless the

---

53. See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

54. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883.

55. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 269, 15 OBR 379, 473 N.E.2d 768.

56. *Smith,* 14 Ohio St.3d at 14, 14 OBR 317, 470 N.E.2d 883.

trial court has taken specific actions that have tempered the prejudice from the comments, "it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found [the] defendant guilty." [57] Where the defendant has failed to object to improper comments, this court will reverse only when the defendant has demonstrated plain error. Plain error is an obvious error or defect in the trial affecting substantial rights and "but for the error, the outcome of the trial court clearly would have been otherwise." [58]

{¶ 104} Smith objected several times during the state's rebuttal closing argument. First, Smith objected after the prosecutor accused defense counsel of "sandbagging" the state by using Franklin's medical records in closing argument to undermine Franklin's credibility. The medical records indicated that Franklin was shot in the front of his leg, contradicting Franklin's testimony that he was shot in the back of his leg. The medical records were admitted into evidence, but defense counsel did not cross-examine Franklin on this discrepancy. Rather, defense counsel referred to the medical records in closing argument to discredit Franklin's testimony that he was attempting to flee when he was shot.

{¶ 105} The "sandbagging" accusation was improper and unfounded.[59] The state had possessed Franklin's medical records for over three years and had used them in Smith's first trial. But Smith's objection to the derogatory reference to defense counsel was sustained, and the trial court instructed the jury to disregard the comment.

{¶ 106} Next, Smith complains that the prosecutor improperly insinuated to the jury that defense counsel did not believe his client's defense. The prosecutor stated in reference to Smith's closing argument, "We give closing argument. We're going to talk about self-defense for five minutes. That's how strong that self-defense theory is, isn't it? Five minutes of an hour-and-a-half closing argument. We don't want to get anywhere near that self-defense argument."

{¶ 107} Smith objected, but before the court could rule, the prosecutor added, "Because his story is so incredible." The trial court overruled Smith's objection to these comments.

{¶ 108} The prosecutor's first comment was improper for two reasons: (1) it mischaracterized Smith's closing argument, which almost in its entirety refuted the state's claim that Smith did not shoot the victims in self-defense, and (2) it attempted to present the jury with the irrelevant but potentially prejudicial

57. Id. at 15, 14 OBR 317, 470 N.E.2d 883.

58. *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646; see, also, Crim.R. 52(B).

59. See *Williams*, 79 Ohio St.3d at 14, 679 N.E.2d 646.

insinuation that defense counsel personally thought that Smith was guilty.[60] But the prosecutor had earlier made a similar comment that Smith had not objected to, and the jury was informed on several occasions that closing argument was merely argument.

{¶ 109} The prosecutor's additional comment that Smith's claim of self-defense was "incredible" came close to an improper expression of the prosecutor's personal opinion about Smith's guilt. But the prosecutor followed the comment with a summary of the state's evidence contradicting Smith's defense, rendering the comment arguably within the latitude afforded counsel.[61]

{¶ 110} Later, the prosecutor cited matters not in evidence when he insinuated that Smith had come up with his self-defense theory only after the crime laboratory found gunshot residue on Gordon. The prosecutor had made a similar statement earlier in closing argument, when he, without objection, "testified" that Smith did not claim self-defense when proceedings were first instituted against him.

{¶ 111} But the prosecutor did tie this argument to the evidence by illustrating that Smith did not mention self-defense to Pat Barry when Barry drove Smith to the police station to turn himself in. Further, after Smith objected to the comment about the timing of the defense in relationship to the release of the crime lab report, the trial court informed the jury that closing argument was not evidence and that the jury was to determine the facts of the case.

{¶ 112} We hold that the trial court's actions in response to Smith's objections were sufficient to eliminate any prejudice from the prosecutor's misconduct, and that the jury would have found Smith guilty absent the prosecutor's improper remarks.

{¶ 113} Next we review other comments that Smith alleges were improper but that were not objected to at trial. The prosecutor referred to defense counsel's attack on the credibility of the state's witnesses as "outrageous" and called the self-defense theory "ridiculous." The prosecutor also attempted to inject emotion into the jury's deliberations and again "testified" by adding, "I'm fighting for Jimmy Gordon. If you think the Prosecutor's Office—I guess, you know, I guess there is [sic] some people out there that say, well, they don't fight for a black, a black person who is a drug dealer. Well, I got news for you, that's exactly what Dave and I, Dave Feldhaus, are doing." But Smith did not object to these remarks, and they were not so egregious in the context of the entire trial

---

60. See *State v. Keenan* (1993), 66 Ohio St.3d 402, 405–406, 613 N.E.2d 203.

61. Id. at 408, 613 N.E.2d 203.

that they denied Smith a fair trial, especially in light of the substantial evidence in support of his conviction.

{¶ 114} Finally, Smith argues that this court must reverse to force the prosecution to abide by our warning in Smith's first appeal that it must refrain from misconduct during closing argument.[62] But our misconduct review focuses on "the fairness of the trial, not the culpability of the prosecutor." [63] We consider the prosecutor's behavior a reaction to Smith's own misconduct at retrial, but nonetheless we do not condone it. We certainly expect the prosecution, as well as the defense, including Smith, to abide by the rules of evidence and to exhibit decorum when Smith is retried for shooting Dingo.

{¶ 115} Accordingly, the assignment of error is overruled.

### Court's Bias and Prejudice

{¶ 116} In Smith's first pro se assignment of error, which we refer to as his eighth assignment of error, he alleges that the trial court's bias and prejudice against him tainted his entire trial and denied him due process. Smith made the same argument when he availed himself of the statutory remedy for a claim of bias and prejudice against a trial judge.[64] The Chief Justice of the Ohio Supreme Court considered Smith's motion to disqualify the trial judge and denied it. Smith later asked the Chief Justice to reconsider his motion after his second trial ended and a trial date was set before the same judge on the murder count on which the jury could not reach a verdict. Smith represented to this court that the Chief Justice also denied this motion.

{¶ 117} We have no authority to review the decision of the Chief Justice denying Smith's motion to disqualify the trial judge on the basis of bias and prejudice. The Ohio Constitution provides the Chief Justice or his assignee with the sole power to disqualify a trial or appellate judge on the basis of bias and prejudice.[65]

{¶ 118} This court does have the authority to review the trial court's rulings for alleged errors of law or procedure that Smith claims stem from bias, and we have done so in this appeal and in other proceedings. Accordingly, we have nothing to review under this assignment of error, and we overrule it.

---

**62.** See *State v. Smith,* 1st Dist. No. C–020610, 2004-Ohio-250, 2004 WL 102285, at ¶ 46.

**63.** *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

**64.** See R.C. 2701.03.

**65.** Section 5(C), Article IV, Ohio Constitution.

### Ineffective Assistance of Trial Counsel

{¶ 119} In his ninth assignment of error, Smith argues that the trial court prevented the effective assistance of trial counsel when it denied defense counsel a continuance to prepare for trial.

{¶ 120} We have held under the second assignment of error that the trial court acted within its discretion when it denied defense counsel a continuance requested less than three months before trial. We noted that defense counsel's performance was more than adequate, and that although defense counsel was retained only 47 days before the trial date, defense counsel was intimately familiar with the facts and issues of the case because he had prevailed in Smith's first appeal.

{¶ 121} Smith has not cited anything in this record to demonstrate that defense counsel was deficient or that he was prejudiced by any deficiency, which is the prerequisite to making a successful claim of ineffective assistance of trial counsel.[66] Accordingly, we overrule the assignment of error.

### Compulsory Process

 {¶ 122} In his tenth assignment of error, Smith argues that his right to compulsory process was violated when the trial court quashed the defense subpoena of Charlie Luken, the mayor of Cincinnati at the time. Smith had subpoenaed Luken to testify about the "climate" in the Pendleton area of Over–the–Rhine at the time of the shootings and about a public-service message Luken had allegedly made that urged citizens to call the police if they saw a crime committed. Smith claimed that this testimony was necessary for him to demonstrate the reasonableness of his fear of death at the time of the shootings and to explain why Smith had continually called the police before the shootings. Luken claimed that he did not have any knowledge of the particular facts of the shootings and that he did not remember making a public announcement urging citizens to call the police during the period after the April 2001 riots.

 {¶ 123} In all criminal prosecutions, a defendant has the constitutional right to compulsory process for obtaining witnesses in his favor.[67] A defendant exercises this right by having the clerk issue a Crim.R. 17(A) subpoena. But where a subpoena is challenged, the defendant must make a "plausible showing"

---

66. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

67. Sixth Amendment to the United States Constitution; Section 10, Article I, Ohio Constitution.

of how the witness's testimony will be "both material and favorable to his defense."[68] This showing is essential to establish a constitutional violation.

{¶ 124} The trial court granted Luken's motion to quash the subpoena after carefully considering that Luken could not present any evidence to bolster Smith's defense other than general, vague testimony about the violence and crime in the area, and that Smith's witness, Jim Tarbell, a city council member and resident of Over–the–Rhine, had provided more specific testimony on this issue at Smith's first trial. Tarbell testified again at Smith's second trial.

{¶ 125} We hold that the trial court did not err in quashing the subpoena because Smith failed to make any plausible showing that Luken's testimony would have been both material and favorable to his defense.[69] Accordingly, the tenth assignment of error is overruled.

### Expert–Witness Testimony

{¶ 126} In his eleventh assignment of error, Smith argues that because criminalist Ronald Camden was not qualified as a ballistics expert, he should not have been permitted to testify about the significance of the location of the shell casings found at the scenes. Smith claims that this testimony prejudiced him because it was not consistent with Smith's version of the facts and cast doubt on Smith's testimony.

{¶ 127} At the time of trial, Camden had been a criminalist for nine years. Prior to becoming a criminalist, Camden had been a police officer for 27 years. For ten years, he had used a 9mm semiautomatic weapon like the one Smith discharged.

{¶ 128} Camden testified that he could not give any testimony on how Smith held the weapon because he was not a ballistics expert. He also explained that he could not predict with certainty where Smith was standing when he discharged the weapon. But he did testify that, based upon his own observation at a shooting range, the spent casing from a 9mm semiautomatic weapon would travel five to ten feet after discharge. Based upon this, he identified a general location where Smith was standing when he discharged the firearm. This location was not consistent with Smith's testimony about where he was standing when he shot his victims.

{¶ 129} Smith did not object to any of this testimony and actually elicited testimony from Camden on cross-examination that the casings could have trav-

---

68. *United States v. Valenzuela–Bernal* (1982), 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193.

69. See *State v. Studer* (Nov. 25, 1991), 12th Dist. No. CA91–06–101, 1991 WL 247525.

eled further because of the incline, or that they could have been inadvertently displaced from where they had initially stopped. Without an objection, we can reverse only when the admission of the testimony amounted to plain error.

{¶ 130} We do not find any error, much less plain error, in the admission of Camden's testimony. Camden was qualified to provide the challenged testimony based upon his ten years' experience discharging a 9mm semiautomatic weapon. He had knowledge to assist the jury in performing its fact-finding function, even though he did not have complete knowledge to qualify as a ballistics expert.[70] Further, Camden clearly informed the jury of the limitations of his testimony.

{¶ 131} Accordingly, the 11th assignment of error is overruled.

## Motion to Dismiss the Indictment

{¶ 132} In his 12th assignment of error, Smith argues that the trial court erred in overruling his motion to dismiss the indictment. On remand, Smith had moved to dismiss the indictment, claiming that the prosecutor had committed misconduct in his first trial and that his retrial under these circumstances was barred by the Double Jeopardy Clause. Smith's argument is without merit for two reasons.

{¶ 133} First, as we have discussed under the third assignment of error, a successful appeal of a conviction generally prevents a plea of double jeopardy on remand under either the federal constitution or the state constitution.[71] Some courts have found double jeopardy a bar to successive prosecution when reversal after an appeal is based upon prosecutorial misconduct.[72] But the Ohio Supreme Court has declined to adopt this exception to the general rule.[73]

{¶ 134} Second, although this court had warned the prosecutor that his misconduct in the first trial may have served as grounds for reversal, the misconduct was not the basis for the reversal.[74] We reversed Smith's convictions because the trial court had denied Smith his right to self-representation.

{¶ 135} Smith's argument that the trial court erred in overruling his motion to dismiss the indictment is meritless for both of these reasons. Accordingly, the 12th assignment of error is overruled.

---

70. See *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128. See, also, Evid.R. 701 and 702(A)(B).

71. See *State v. Keenan* (1998), 81 Ohio St.3d 133, 141, 689 N.E.2d 929.

72. Id., citing *United States v. Wallach* (C.A.2, 1992), 979 F.2d 912, 916.

73. Id.

74. See *State v. Smith,* 1st Dist. No. C–020610, 2004-Ohio-250, 2004 WL 102285, at ¶ 46.

## Conclusion

{¶ 136} Smith's convictions for the felonious assault of Dingo are reversed, and this case is remanded for a new trial on these two counts of the indictment. The findings of guilt for the felonious assault of Andre Ridley, the felonious assault of Bill Franklin, and having a weapon under a disability are affirmed. But the sentences for these offenses are vacated, and this case is remanded for a new sentencing hearing consistent with this decision.

Judgment accordingly.

HILDEBRANDT, P.J., SUNDERMANN and HENDON, JJ., concur.