[Cite as *State v. Smith*, 2014-Ohio-2057.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 100204**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DAMON SMITH

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-568038

**BEFORE:** Jones, P.J., Keough, J., and Stewart, J.

**RELEASED AND JOURNALIZED:** May 15, 2014

**ATTORNEY FOR APPELLANT**

Stephen L. Miles
20800 Center Ridge Road, Suite 405
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Kristin Karkutt
       Edward D. Brydle
Assistant County Prosecutors
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., P.J.:

{¶1} Defendant-appellant Damon Smith appeals his involuntary manslaughter and felonious assault convictions. We affirm.

{¶2} In 2012, Smith and codefendant Cynthia Robinson were charged with two counts of murder and two counts of felonious assault. Prior to trial, Robinson pleaded guilty to aggravated assault and was placed on three years of community control sanctions. *State v. Robinson*, Cuyahoga C.P. CR-12-568038-B. Smith's case proceeded to a jury trial at which the following pertinent evidence was presented.

{¶3} Robinson and her boyfriend, Melvin Jackson, went over to Smith's apartment to watch television. According to Robinson, the three of them drank beer and liquor, and smoked crack cocaine. At some point, Robinson and Jackson began arguing and the argument turned physical.

{¶4} Either Smith or Robinson called 911. The 911 operator overheard screaming and "a fight going on." The call was transferred to Cleveland EMS; Smith told the dispatcher that he was "cut," and he needed the police to get someone out of his house. Jackson was heard in the background during the calls; twice he stated "I can't breathe."

{¶5} A few minutes after Smith's conversation with EMS, the Cleveland police called back; Robinson answered the phone. The dispatcher asked Robinson what happened and she replied "I don't know," "We need your help," and "I don't understand."

Smith got on the phone and said: "Right now, I'm holding down somebody * * * I'm holding somebody down * * * right now he's not fighting * * * right now I need this person out of my house." During this call, Jackson could not be heard in the background.

{¶6} Paramedic Larry Boyer testified that when he and a fellow paramedic arrived at Smith's apartment, Smith and Robinson were waiting outside. Smith told Boyer that his friend was upset and inside "tearing up the place." Smith appeared "relaxed and calm." Because the situation might be dangerous, Boyer testified he was supposed to wait for police to arrive before he entered the apartment. However, Boyer and his coworker entered the apartment after two to three minutes without police assistance because they did not hear any noise emanating from the interior of the apartment. Neither Smith nor Robinson requested medical attention nor stated that Jackson might be injured.

{¶7} Boyer found Jackson kneeling on the floor, facedown on a couch cushion. Boyer could not find a pulse; Boyer and his fellow paramedic spent 21 minutes unsuccessfully trying to revive Jackson. Jackson was transported to the hospital where he was pronounced dead.

{¶8} Smith told the responding police officer that Jackson and Robinson had been arguing about a time when Jackson hit Robinson. The argument became physical and Jackson tried to choke Robinson. Smith told the officer he tried to defend Robinson and Jackson hit him in the face, so he put Jackson in a chokehold and Jackson somehow

tripped on the carpet.

{¶9} The forensic pathologist testified that she found bruising around Jackson's neck and internal bruising on both sides of his head by his jaw. The internal bruising was most likely caused by blunt force trauma, which the pathologist testified could have been from

> a blow to the right side of his head and a separate blow to the left side of his head by some blunt object that caused a bruise, or it could [have been] one impact to one side of his head while the other side of his head was held in place by a wall or a floor or some other broad, flat surface so he would have sustained two bruises from one impact.

{¶10} The pathologist further testified Jackson had cuts on his right hand and burst blood vessels in his right eye. The pathologist opined that the cause of death was asphyxia due to cervical compression and burst blood vessels in the eye are often seen in cases of cervical compression. She testified that when the vessels of the neck are compressed, "loss of consciousness can occur relatively quickly, in as little as ten seconds. Usually, it's a little bit longer than that, but a minute or two at the longest." The pathologist testified that, based on her findings, if pressure is continually applied following loss of consciousness, eventually the person will stop breathing and die, which is what occurred with Jackson.

{¶11} The toxicologist testified that Jackson's blood alcohol level was 0.163 and he had metabolites of cocaine in his system, but was most likely not under the influence of cocaine at the time of this death.

{¶12} Smith sought medical treatment after the incident. His medical records

indicated that "[p]atient states there was a fight in my crib. I got hit and fell and caught myself on left hand. Patient states he does not know what cut him."

{¶13} Detective Timothy Entenok arrived at the crime scene after Jackson was transported to the hospital. He noted that the apartment was cluttered and dirty but he saw no signs of a struggle and did not initially recover any weapons. The detective located two crack pipes on Smith's bedroom dresser.

{¶14} Detective Entenok interviewed Smith at the station; he described him as being "calm and cooperative." Smith told the detective that he had a sword that he used to try to scare Jackson, but he did not cut him with it. After this interview, police recovered the sword hidden behind Smith's couch, the sword had blood on the blade. During his second interview, Smith told the detective that Jackson made a sweeping move at the sword and cut himself.

{¶15} The forensic scientist who performed the DNA tests on the evidence recovered from Smith's apartment testified that she could not exclude Smith as a contributor of the DNA found under Jackson's fingernails on his right hand. The blood found on the handle and blade of the sword, a washcloth, and watch taken from the apartment belonged to Smith.

{¶16} Robinson testified that she had known Smith for seven or eight years but had only known Jackson a short while and they had a tumultuous relationship. She and Jackson went to Smith's apartment to watch football the night of his death. She bought a bottle of liquor and Smith got some drugs. They drank beer, liquor, and smoked the

drugs. She and Jackson argued about her mother and his treatment of her (Robinson). According to Robinson, she was sitting and watching the game when, all of the sudden, she looked over and saw Smith on the floor. Jackson was preventing Smith from using the bathroom. Robinson testified she got up and put herself between the two men, but Jackson hit her in her face "three or four times" and pulled her hair. Smith told Jackson to stop and he and Jackson started "tussling" on the couch.

{¶17} Robinson testified that she called 911. At some point after calling 911, she checked Jackson's pulse, which "wasn't strong, but it was there." Robinson admitted she cleaned up the beer cans and put Smith's crack pipes on his dresser before police arrived. She denied hiding the sword and claimed she never saw Smith brandish the sword, she only saw it lying on the floor after Smith cut himself.

{¶18} Robinson testified she remembered Jackson saying, at one point, "Stop, I can't breathe." She claimed Jackson never choked her nor did she put Jackson in a chokehold; Smith was the one who held him down. She further testified she was afraid for her life because Jackson was acting "enraged."

{¶19} Smith testified that he got up to use the bathroom when Robinson and Jackson were arguing about a past fight. Jackson told him to sit down, which he did, but he then got up again to go to the bathroom. It was at this time, according to Smith, that Jackson hit him and then turned to assault Robinson. Smith got his sword, and swung it at Jackson to get his attention. Smith testified that Jackson grabbed the sword by the blade, but Smith was able to drop the sword to the floor, cutting his own wrist in the

process.    Smith testified that he then called 911.

**{¶20}** According to Smith, Jackson was assaulting Robinson again, so Smith put him in a chokehold.   Smith claimed that he released Jackson after Jackson stopped resisting and did not choke him further or hold him after this point.   Once Jackson stopped resisting, Smith got up to tend to his injuries.   He claimed he stayed inside the apartment until EMS arrived and hurried the paramedic inside to treat Jackson.

**{¶21}** Smith denied smoking crack cocaine that evening and testified that the paramedic was being untruthful about what happened that evening.   Smith insisted Jackson did in fact choke Robinson and then Robinson had Jackson in a chokehold and held him down.   He claimed he was acting in self-defense and in defense of Robinson. He admitted he put Jackson in a chokehold but Jackson never went limp.   He further admitted he never checked on Jackson after he stopped resisting even though Jackson was no longer moving, testifying he thought the "alcohol got the best of him [Jackson]."

**{¶22}** The jury convicted Smith of one count of involuntary manslaughter as a lesser included offense of murder and one count of felonious assault but acquitted him of the rest of the charges.   The state stipulated that the convictions were allied offenses of similar import and elected to proceed to sentencing on the felonious assault conviction.

**{¶23}** The trial court sentenced Smith to five years in prison.

**{¶24}** Smith filed a timely notice of appeal.

## II.   Assignments of Error

I.   The appellant's convictions for involuntary manslaughter and felonious assault were against the manifest weight of the evidence.

II.    Whether the trial court erred by not instructing the jury on aggravated assault.

III.    Whether the appellant received ineffective assistance of counsel.

### III.    Law and Analysis

**Manifest Weight**

{¶25} In the first assignment of error, Smith argues that his convictions were against the manifest weight of the evidence.

{¶26} In a manifest weight analysis, an appellate court "reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and * * * resolves conflicts in the evidence." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A court reviewing questions of weight is not required to view the evidence in a light most favorable to the prosecution, but may consider and weigh all of the evidence produced at trial. *Id.* at 390 (Cook, J., concurring). An appellate court may not merely substitute its view for that of the jury, but must find that the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction    must be reversed and a new trial ordered." *Id.* at 387. "Special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact." *Id.* at 390 (Cook, J., concurring). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶27} The jury found Smith guilty of involuntary manslaughter, in violation of

R.C. 2903.04(B), that prohibits any person from causing the death of another as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree; in this case, the indictment listed the misdemeanor of assault.   The jury also found Smith guilty of felonious assault, in violation of R.C. 2903.11(A)(1), that prohibits any person from causing serious physical harm to another.

{¶28} Smith argues that the jury lost its way because it rejected his claim of self-defense.   To establish self-defense, the defendant must demonstrate by a preponderance of the evidence that (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of great bodily harm and that his only means of escape from such danger was in the use of such force;   and (3) he must not have violated any duty to retreat or avoid danger.   *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990); *see also State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus.   The elements of self-defense are cumulative and "'[i]f the defendant fails to prove any one of these elements by a preponderance of the evidence, he has failed to demonstrate that he acted in self-defense.'" (Emphasis deleted.)   *Williford* at *id.*, quoting *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986).

{¶29} Smith claims that he was acting in self-defense when he tried to scare Jackson off with the sword and then placed him in a chokehold.   He points to the facts that he called 911 and was cooperative with police to support his self-defense claim.

{¶30} We are reminded, however, that although an appellate court does consider

the credibility of the witnesses in addressing a manifest weight of the evidence argument, it is the trier of fact that "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Williams*, 8th Dist. Cuyahoga No. 94965, 2013-Ohio-4471, ¶ 23, *appeal not allowed*, 2014-Ohio-889, citing *State v. Ross*, 8th Dist. Cuyahoga No. 98763, 2013-Ohio-3130, ¶ 30. Therefore, the reviewing court affords great deference to the trier of fact's determination of witness credibility. *Williams* at *id.* citing *Ross*.

{¶31} Immediately following the incident and during the investigation, Smith gave police inconsistent descriptions of the evening's events. During his first video-recorded interview with police, Smith stated that Jackson did not come into contact with the sword. The next day, after the detectives told Smith that Jackson sustained cuts to his right hand, Smith told the detectives that Jackson had made a "karate move" and grabbed the sword's blade. He told the detectives they would find Jackson's DNA on the sword. But the only DNA recovered from the sword belonged to Smith.

{¶32} Also during his first interview with police, which lasted over an hour, Smith never told police that Robinson choked Jackson. After finding out Jackson's cause of death, Smith insisted that Robinson had Jackson in a chokehold before he did.

{¶33} Smith also testified that he did not smoke crack cocaine on that night and the crack pipes on his dresser did not belong to him. But Robinson testified that Smith bought the drugs with her money, the three of them smoked the crack cocaine, and she

put the crack pipes where Smith usually kept them, on his dresser, before police arrived.

{¶34} Smith also testified that he ran outside the apartment to flag down the ambulance and hurry the paramedics inside to assist Jackson. The paramedic, however, testified that Smith was outside, appeared calm, and told him that Jackson was inside "tearing the place up." The paramedic also stated that Smith never told him that Jackson needed medical attention, even though Smith later told police he waited in the apartment 10 to 12 minutes before EMS arrived and Jackson never moved.

{¶35} Smith testified that as soon as Jackson stopped trying to hit him, he let him go but Jackson never went limp. The forensic pathologist contradicted this testimony when she testified that when a person loses consciousness, their body usually goes limp. Again, Jackson's cause of death was asphyxia due to cervical compression, or from having the vessels in his neck compressed. The pathologist testified that if the force is removed from around the neck after the body goes limp, blood flow is restored and a person would regain consciousness. But if the pressure is not removed, within four to five minutes the person would stop breathing, suffer irreversible brain damage, and die.

{¶36} The pathologist opined that because the pressure on Jackson's neck was continually applied following loss of consciousness, he eventually stopped breathing and died. During the initial 911 call, Jackson twice stated he could not breathe. During the 911 callback, Smith told the dispatcher he was holding Jackson down and Jackson was no longer fighting, but Jackson could no longer be heard in the background. The state's theory was that Smith choked Jackson until he lost consciousness, continued to choke him

until he stopped breathing, and then left him facedown in the couch cushion, further obstructing his airway.

**{¶37}** The jury was given the opportunity to assess Smith's credibility and the validity of his self-defense claim. Faced with conflicting evidence, the jury chose to reject Smith's claims. Based on the totality of the evidence presented at trial, it is reasonable that the jury found the state's witnesses and Robinson's testimony more credible than Smith's. We therefore cannot say that this is an exceptional case in which the evidence weighs heavily against conviction.

**{¶38}** The first assignment of error is overruled.

**Jury Instructions**

**{¶39}** In the second assignment of error, Smith argues that the trial court erred when it failed to instruct the jury on the crime of aggravated assault, an inferior degree of felonious assault.

**{¶40}** We initially note that Smith never requested the instruction at trial; therefore, we review this issue under the plain error standard. *See State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 40; *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.

**{¶41}** Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected

the outcome of the trial. *Barnes* at *id.* Courts are to notice plain error under Crim.R. 52(B), "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." (Citation omitted.) *Id.*

{¶42} R.C. 2903.12, which prohibits aggravated assault, provides, in part:

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:

(1) Cause serious physical harm to another * * *;

(2) Cause or attempt to cause physical harm to another * * * by means of a

deadly weapon * * * .

{¶43} Aggravated assault is an inferior degree offense of felonious assault. *State v. Horton*, 9th Dist. Summit No. 25407, 2013-Ohio-3902, ¶ 52, citing *State v. Bostick*, 9th Dist. Summit No. 25853, 2012-Ohio-5048. Thus, "in a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury." *Bostick* at ¶ 6. "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force." *Horton* at *id.*, citing *State v. Deem*, 40 Ohio St.3d 205, 211, 533 N.E.2d 294 (1988).

{¶44} In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded the defendant at the time. *State v. Booker*, 6th Dist. Lucas No. L-10-1140, 2013-Ohio-45, ¶ 26, *appeal*

*not allowed*, 136 Ohio St.3d 1512, 2013-Ohio-4657, 995 N.E.2d 1214, citing *State v. Mabry*, 5 Ohio App.3d 13, 449 N.E.2d 16 (8th Dist.1982).

**{¶45}** Courts have further divided the analysis of whether the provocation was reasonably sufficient to prompt sudden passion or fit of rage into an objective prong and a subjective prong. *See Booker*; *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992). For the objective prong, the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Shane* at 634. As to the subjective prong, the inquiry is "whether the defendant in the particular case 'actually was under the influence of sudden passion or in a sudden fit of rage[.]'" *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998), quoting *Shane* at 634-635.

**{¶46}** In *Horton*, the Sixth Appellate District declined to find plain error because the evidence did not indicate that the appellant was subjectively under the influence of sudden passion or in a sudden fit of rage to incite the use of deadly force. The appellant testified that he intentionally fired shots in the victim's direction because he feared for the safety of another. The court noted that the appellant's testimony, which indicated that he acted out of fear, was "'insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage.'" *Id.* citing *Mack* at 201.

**{¶47}** Therefore, the *Horton* court reasoned, "even if the events leading up to the shootings could be viewed as sufficiently provocative under an objective standard in the instant case," there was no evidence that the appellant "subjectively acted under the influence of sudden passion or fit of rage brought on by serious provocation occasioned

by the victim that was reasonably sufficient to incite defendant into using deadly force." *Id.* at ¶ 54.

**{¶48}** In *Booker*, *supra*, the appellant shot two people, one of whom survived. The appellant claimed that the trial court erred in failing to instruct the jury on aggravated assault; the appellate court reviewed his claim for plain error. The appellate court found that the appellant's testimony, that the surviving victim "pistol whipped" and robbed appellant during a drug deal, was for the most part corroborated by the surviving victim and an eyewitness. *Id.* at ¶ 28. The court noted that despite the victim's actions, the appellant admitted that he was not mad after being hit by the victim, only afraid.

**{¶49}** The court determined that the record contained no evidence that the appellant's actions were influenced by sudden passion or fit of rage at the time he shot the victims. Therefore, the court concluded, as the *Horton* court did, that even if the events leading up to the shootings could be viewed as sufficiently provocative under an objective standard, there was no evidence that appellant subjectively acted under the influence of sudden passion or fit of rage brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the appellant into using deadly force. *Id.* at ¶ 28.

**{¶50}** As applied to this case, we find no plain error in the omission of aggravated assault in the jury instructions. Smith never testified to a version of events that would lead one to believe that he acted out of a sudden fit of rage brought on by provocation from Jackson. Smith testified: "I wasn't going to let him fight me or hit me anymore.

It was to protect myself and tell him it was time to go." Smith testified he was "calm" after Jackson stopped fighting him and "calm" when EMS showed up; the paramedic corroborated this testimony by stating that Smith was "calm and relaxed" when EMS arrived.

{¶51} Thus, even if the events leading up to Smith placing Jackson in a chokehold could be viewed as sufficient provocation under an objective standard, there was no evidence that Smith subjectively acted under the influence of sudden passion or fit of rage brought on by serious provocation by Jackson that was reasonably sufficient to incite Smith into using deadly force. *See Horton* at ¶ 54; *Booker* at *id.*

{¶52} Moreover, Smith's theory of the case was that he acted in self-defense when he placed Jackson in a chokehold. The mental states of fear as required for self-defense and rage as required for aggravated assault are incompatible. *State v. Cremeans*, 9th Dist. Summit No. 22009, 2005-Ohio-261, ¶ 16. As such, many districts in Ohio have held that self-defense and aggravated assault instructions should not be given together in most situations. *State v. Krug*, 11th Dist. Lake No. 2008-L-085, 2009-Ohio-3815; *State v. Cremeans*, 9th Dist. Summit No. 22009, 2005-Ohio-261; *State v. Owens*, 5th Dist. Richland No. 2004-CA-87, 2005-Ohio-4402; *State v. Coffman*, 10th Dist. Franklin Nos. 98AP-259 and 98AP-280, 1998 Ohio App. LEXIS 5418 (Nov. 10, 1998); *compare State v. Perry*, 5th Dist. Licking No. 01CA23, 2001 Ohio App. LEXIS 3652 (Aug. 17, 2001) (noting that an aggravated assault instruction could be given in a self-defense case, where circumstances are such that the defendant exceeded the amount of force necessary for his

defense, out of passion or rage).[1]

{¶53} In light of the above, there was no plain error by the trial court's failure to instruct the jury on aggravated assault.   The second assignment of error is overruled.

**Ineffective Assistance of Trial Counsel**

{¶54} In the third assignment of error, Smith claims that he was afforded ineffective assistance of trial counsel because counsel did not request a jury instruction on aggravated assault.

{¶55} We review a claim of ineffective assistance of counsel under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   In order to prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that his counsel's performance fell below an objective standard of reasonable representation; and if so, show there was a reasonable probability that his counsel's errors affected the outcome of the proceedings.   *Id.*   Further, judicial scrutiny of a lawyer's performance must be highly deferential.   *State v. Sallie*, 81 Ohio St.3d 673, 674, 693 N.E.2d 267 (1998).   Therefore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

---

[1] A cursory review of our district's case law revealed that jury instructions on voluntary manslaughter and self-defense were in error because the two legal theories are incompatible.   Voluntary manslaughter, like aggravated assault, requires that the defendant be under the influence of sudden passion or a fit of rage, while self-defense requires the defendant to be in fear for his or her own personal safety.   *See State v. Jefferson*, 8th Dist. Cuyahoga No. 97331, 2012-Ohio-2387, ¶ 26; *see also State v. Williamson*, 8th Dist. Cuyahoga No. 95732, 2011-Ohio-4095;   *State v. Loyed*, 8th Dist. Cuyahoga No. 83075, 2004-Ohio-3961.

challenged action might be considered sound trial strategy." *Strickland* at 688.

{¶56} In this case, trial counsel was not ineffective for failing to request the court to instruct the jury on aggravated assault. In addition to our not finding plain error in the omission of an aggravated assault instruction to the jury under the second assignment of error, the decision to request a jury instruction on a lesser included (or inferior degree) offense constitutes trial strategy and does not provide a basis for claiming ineffective assistance of counsel. *State v. Owens*, 8th Dist. Cuyahoga No. 98165, 2012-Ohio-5887, ¶ 17, citing *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996). Again, Smith's theory of the case was that he acted in defense of himself and Robinson, which counsel could have logically decided was inconsistent with requesting a jury instruction on aggravated assault.

{¶57} Therefore, the third assignment of error is overruled.

{¶58} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
MELODY J. STEWART, J., CONCUR