[Cite as *State v. Bouie*, 2019-Ohio-4579.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 108095 |
| v. | : | |
| DEON BOUIE, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 7, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-625670-B

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Eben McNair, Megan A. Helton, and Owen M. Patton, Assistant Prosecuting Attorneys, *for appellee.*

Stephen L. Miles, *for appellant.*

MARY J. BOYLE, P.J.:

**{¶ 1}** Defendant-appellant, Deon Bouie, appeals his convictions. He raises three assignments of error for our review:

> 1. The appellant's convictions were against the manifest weight of the evidence.
>
> 2. The trial court erred by not instructing the jury on aggravated assault.
>
> 3. The appellant received ineffective assistance of counsel.

**{¶ 2}** Finding no merit to his assignments of error, we affirm.

## I. Procedural History and Factual Background

**{¶ 3}** On February 13, 2018, a Cuyahoga County Grand Jury indicted Bouie for one count of attempted murder, a felony of the first degree, in violation of R.C. 2923.02 and R.C. 2903.02(A); four counts of felonious assault, felonies of the second degree, in violation of R.C. 2903.11(A)(2); one count of felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1); one count of domestic violence, a felony of the fourth degree, in violation of R.C. 2919.25(A); one count of having weapons while under a disability, a felony of the third degree, in violation of R.C. 2923.13(A)(3); and one count of tampering with evidence, a felony of the third degree, in violation of R.C. 2921.12(A)(1). The counts for attempted murder, felonious assault, and domestic violence all carried one- and three-year firearm specifications.

**{¶ 4}** Bouie pleaded not guilty to the indictment, and the case proceeded to a jury trial in December 2018. Bouie waived his right to a jury trial on the weapons-

disability charge, which was heard by the bench. The following evidence was presented at trial.

{¶ 5} On the evening of January 31, 2018, Shawnelle Howard was driving around with her cousin, Jamie Manning, and two friends, Nancy Jo Robinson and Demetrius Solomon.[1] Solomon was sitting in the front passenger seat of the vehicle. Around 11:00 p.m., Howard received a call from Bouie, who is the father of Howard's child. Howard said that she and Bouie had an "off and on" relationship, but that their relationship was "on" in January 2018. Howard explained that at that time, she and Bouie lived together in a house on E. 144th Street in Cleveland, Ohio, but Bouie did not have a key to the house. Bouie called Howard so that she would come to the house and unlock the door for him. Howard told Bouie that she would "be there shortly." Howard also testified that she did not tell Bouie who was in the car with her and that she was not romantically involved with Solomon.

{¶ 6} When Howard and the others arrived at the house on E. 144th Street, Howard parked her car in the driveway, which was to the right of the home, left the driver's side door open, and walked up to the front door. When she reached the front door, Howard said that Bouie came out of the house. Howard and Bouie "got into an altercation verbally" and Bouie "was trying to get past [Howard], like trying to move [her] out of the way so he [could] get to the car." Bouie was angry that Solomon was in Howard's car. Howard said that she and Bouie "were tussling" near

---

[1] Robinson did not cooperate with police and would not give a statement.

her car when she "collapsed" and "saw darkness." The next thing that Howard remembered was Bouie "screaming in [her] face" and asking her where she had been shot. She also remembered Bouie trying to put her in her car. Howard did not remember hearing gunshots before she collapsed. She testified, however, that she did not see a gun in Bouie's hands because "[she] was in his hands." When asked if she believed Bouie was acting in self-defense, Howard said, "I would say so, I mean, but I didn't see him shoot, so — I didn't see him shoot so I can't say I saw him acting in self-defense."

{¶ 7} On cross-examination, Howard stated that although she spoke to Bouie a number of times while he was in jail, he never told her to lie. She said they spoke about her injuries and about their son during those calls.

{¶ 8} Detective John Freehoffer interviewed Howard at the hospital. He said that Howard told him that Solomon was acting in self-defense. He included that fact in his report. Howard testified that when Detective Freehoffer came to the hospital to take her statement, she had just awoken from a medically induced coma and did not remember speaking to him. Howard also denied telling Detective Freehoffer at the hospital that Solomon shot in self-defense and said that the detective would be lying if he said she told him that.

{¶ 9} Detective Freehoffer stated that he later interviewed Howard when she was in a rehabilitation center. He said that Howard's version of events was not consistent with what she originally told him at the hospital. He also said that

Howard was hostile toward him during the interview. She refused to give Detective Freehoffer a recorded statement.

{¶ 10} Manning's version of the events differed from Howard's version. According to Manning, she did not think that Bouie and Howard were still in a relationship as of that night "because of an incident" that occurred two weeks previously. Manning did not think that Bouie was living with Howard because Howard had recently changed the locks to the home. Manning also thought that Howard and Solomon were together because she heard Howard call him "baby" in the car.

{¶ 11} Manning testified that when Bouie called Howard that night, she heard Howard tell Bouie who was in the car with her. Manning also stated that she did not think that Bouie would still be at the house when they arrived because she heard Bouie tell Howard that he had already left. Manning believed that they were going to stop by the house, Howard was going to unlock the door, and then they would leave.

{¶ 12} According to Manning, when Howard reached the front door to unlock it, Bouie walked out of the house. Manning said Howard "turned right around, came down the stairs" and that "Bouie followed her." Manning testified that Howard and Bouie were talking, but that she could not hear what they were saying. Manning stated that Bouie followed Howard to the vehicle's driver-side door, was "right behind [Howard]," and reached over Howard and started firing into the car towards the front seat where Solomon was sitting.

{¶ 13} Manning testified that she had not seen Solomon with a gun prior to that moment, that she did not hear anyone say anything threatening or provocative to Bouie, and that Bouie just came up to Solomon and started shooting first. Manning said that immediately after Bouie began shooting, Howard turned toward Bouie and tried to stop him. Manning testified that Solomon began shooting back toward Bouie. Manning did not see where Howard was when Solomon returned fire. Manning said that Bouie moved towards the back of the vehicle, and Bouie and Solomon continued shooting at each other through the car.

{¶ 14} Manning testified that Solomon got out of the car and ran down the street while Solomon and Bouie were still shooting at one another. She said that when the shooting finally stopped, she went to Howard, who was lying on the ground next to the vehicle. Manning stated that Howard told her she had been shot and could not feel her legs. Manning called 911.

{¶ 15} Manning testified that Bouie hung around the scene and was talking to another man until the ambulance showed up, which is when he walked to the house across the street.

{¶ 16} Manning initially told police that when she heard gunshots, she put her head down and did not see who fired first. Manning testified that she lied to police and told them that because Bouie "was still on the scene somewhere close enough to that vicinity [and she] didn't want him [to] see [her] talking to any police at that time." Manning later returned to police headquarters and gave a written statement.

{¶ 17} During cross-examination, Manning explained that she knew Bouie and previously dated Bouie's brother. She also agreed that she never liked Bouie very much based on what Howard told her. She also said that she had not talked to Howard since she visited her in the hospital in January because Howard did not want her to testify.

{¶ 18} Bouie testified that he was living with Howard on E. 144th Street on January 31, 2018, and that after doing laundry at his mother's house, he returned home to find the door locked. He said he called Howard and that she told him she would come back to unlock the door for him. He said Howard did not tell him that she was with anybody else and that he did not know Solomon.

{¶ 19} Bouie testified that when Howard arrived and he saw Solomon in the car, he started walking toward the car to make Solomon get out of the car and leave. Bouie said that Howard tried to stop him from walking past her toward the car, and that as he was trying to get past her, "shots rang out." Bouie testified that he got shot in his left shoulder and that he ran to the back of the car. Bouie said that Solomon continued shooting at him through the back window. Bouie stated that he had a 9 mm gun and that as Solomon was "running off" shooting, he fired back at Solomon. Bouie testified that he shot "probably three or four" times, but that Solomon shot first. He said he had no intention of shooting Solomon when he walked toward the car and that he only shot to defend himself and Howard.

{¶ 20} After Solomon left, Bouie said he ran over to help Howard and tried to put her in the car. Bouie testified that Manning and Robinson were present as

well as his friend, Kirk White, who lived directly across the street. Bouie testified that he was at the scene when the ambulance arrived. Bouie said that he was also still on scene when police arrived and that he told an officer the direction in which the shooter had run. Bouie said that he then crossed the street and went to White's house to try to bandage his arm. Bouie testified that he left his gun at White's house and had his mother pick him up and take him to the hospital.

{¶ 21} When police went to the hospital to talk to Bouie, Bouie was not cooperative. Bouie initially denied being at the scene during the shooting. When asked how he got shot, Bouie told police that he had been shot during a robbery on Quincy Avenue.

{¶ 22} On cross-examination, Bouie admitted that he lied to the police at the hospital. He also admitted to telling different versions of what occurred that night. Bouie said that he was scared and under the influence of pain medicine at the hospital when police came to speak to him.

{¶ 23} Bouie later gave a recorded statement to police, which was played in court. In the recording, Bouie told police that he and Solomon had a disagreement. Bouie stated that Solomon shot him and Howard. Bouie said that he was not arguing with Howard at that time, but that Howard was trying to tell him that she and Solomon were just friends. Bouie said that Solomon started shooting at him as he was walking out of the house. When officers asked Bouie if he had a firearm on him when he came out of the house, Bouie said he did not and that he ran back inside the house to retrieve a gun after Solomon started shooting at him. Bouie stated that

when he came outside, Solomon was running down the street.  Bouie also told police that he was not sure if he "hit" Solomon and said that he did not start shooting at Solomon until Solomon started running away.  Bouie also told police that he did not know how many times he fired the gun and that he left the gun at the scene.

{¶ 24} Bouie admitted that he had a felony record, including drug trafficking, burglary, domestic violence, endangering children, assault of a police officer, and resisting arrest.

{¶ 25} White testified that he lived with his girlfriend across the street from Bouie and Howard.  White said that he knew Bouie, but did not know Howard. White was with his girlfriend around midnight when he heard gunshots.  He looked outside and saw a "couple of people" arguing across the street, including Bouie, another man, and Howard.  White testified that he saw Solomon start shooting first, Howard get shot, and Bouie start shooting back.  White then saw Solomon run down the street, and he then went outside to help Bouie put Howard in the car.  White saw that Bouie had been shot in his arm and after the ambulance arrived but before the cops arrived, he had Bouie come back to his girlfriend's house to help him with his arm.  White testified that Bouie asked him if he would "be able to hold the gun for [Bouie] because he was going to the hospital."  White said that Bouie left for the hospital before the cops arrived.

{¶ 26} When police first talked to White in his girlfriend's home, he "was very evasive" and hid the gun from police.  When police returned a short while later, White left the house and told police that he did not have the gun.  When he tried to

walk away, however, police stopped him and White gave them the gun, a semi-automatic Glock 9 mm. White was arrested for carrying a concealed weapon.

{¶ 27} When asked about a voluntary statement that he gave to police in which he said that Howard was already on the ground when he looked out the window, White said that he actually saw the shooting occur.

{¶ 28} Police took photos of the crime scene, including pictures showing spent shell casings from a 9 mm gun and a .45-caliber gun. Police recovered the 9 mm Glock from White (the one that Bouie gave to White to hold for him when he went to the hospital) but they never found the .45-caliber gun. Police found spent shell casings from the .45-caliber gun near the driver's door of Howard's car and inside the vehicle, on the floor of the front passenger seat, and near the front center console. They found 9 mm shells on the ground behind the vehicle and one on the street. The driver's side window of Howard's car and the rear passenger side window were shattered.

{¶ 29} A firearms and tool-mark examiner testified that he authored a report on a 9 mm gun and the spent shell casings found at the scene. He said that based on his analysis, the 9 mm was operable. He further stated the .45-caliber shell casings were fired from the same unknown .45-caliber gun and that the 9 mm shell casings were from the 9 mm Glock seized from White.

{¶ 30} The jury found Bouie guilty of felonious assault of Solomon with the one- and three-year firearm specifications and tampering with evidence. The jury

found Bouie not guilty of the remaining counts. The court found Bouie guilty of having weapons while under a disability.

{¶ 31} The trial court sentenced Bouie to six years on the base charge of felonious assault to be served consecutive to the one- and three-year firearm specifications, which merged into a three-year term. It also sentenced him to 36 months for his conviction for having weapons while under a disability and 36 months for tampering with evidence. The trial court ordered that the sentences for the base charges run concurrent to one another, giving Bouie an aggregate sentence of nine years. The trial court advised Bouie that he was subject to a three-year mandatory term of postrelease control and advised him of the consequences of violating that postrelease control. The trial court also waived Bouie's costs.

{¶ 32} It is from this judgment that Bouie now appeals.

## II. Law and Analysis

### A. Manifest Weight of the Evidence

{¶ 33} In his first assignment of error, Bouie argues that his conviction for felonious assault was against the manifest weight of the evidence.

{¶ 34} A challenge to the manifest weight of the evidence tests whether the prosecution has met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). On review from a manifest-weight challenge, the appellate court is tasked with reviewing all of the evidence in the record and in resolving the conflicts therein, determining whether the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered.'" *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 35} Bouie argues his conviction for felonious assault against Solomon was against the manifest weight of the evidence because (1) the evidence showed he was acting in self-defense and (2) the only witness to testify that Bouie fired his gun first, Manning, was unreliable and provided contradictory testimony.

{¶ 36} R.C. 2903.11(A)(2), the felonious-assault statute, states, "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code."

{¶ 37} In Ohio, self-defense is an affirmative defense that a defendant must prove by a preponderance of the evidence.[2] R.C. 2901.05(A); *State v. Williford*, 49

---

[2] The General Assembly amended R.C. 2901.05 through Am.Sub.H.B. 228, which was effective on March 28, 2019. The amended statute now places the burden of proof of self-defense to the state. The statute states:

> (A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense other than self-defense, defense of another, or defense of the accused's residence as described in division (B)(1) of this section, is upon the accused.
>
> (B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused

Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990). To succeed on a claim of self-defense, a defendant must establish the following three elements: (1) no fault in creating the situation giving rise to the affray; (2) a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was in the use of force; and (3) no violation of any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). Specifically, as to the third element, "[b]efore using deadly force in self-defense, a person must first use any reasonable means of retreat when attacked outside the confines of his or her own home." *State v. Reynolds*, 10th Dist. Franklin No. 18AP-560, 2019-Ohio-2343, ¶ 39, citing *State v. Johnson*, 10th Dist. Franklin No. 06AP-878, 2007-Ohio-2792, citing *State v. Thomas*, 77 Ohio St.3d 323, 673 N.E.2d 1339 (1997).

{¶ 38} Here, the jury was free to believe or not believe that Bouie was at fault in creating the situation. Manning testified that Bouie was at fault in creating the situation, specifically, that Bouie fired his gun first. While Manning's testimony was contradicted by Howard's and Bouie's testimony as well as by the fact that only 9

---

of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

Nevertheless, the statute's changes were not effective at the time of Bouie's trial and he makes no argument that those changes should be applied retroactively.

mm fired cartridges were found at the back of the vehicle, the jury heard those discrepancies and still convicted Bouie of felonious assault against Solomon.

{¶ 39} Even if the jury believed Bouie and found that Solomon shot first, it was still free to reject Bouie's claim of self-defense because Bouie testified that he fired "three or four" shots at Solomon as Solomon ran down the street away from the scene and while still shooting at Bouie. In other words, Solomon was retreating at the time Bouie fired his gun multiple times. Once Solomon was running away, i.e., retreating, Bouie had a duty to stop firing his gun at Solomon because the evidence did not show that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only method of escape was to use deadly force. Therefore, Bouie cannot show that the only means of escape from such danger was to shoot at Solomon or that he had no reasonable means of retreat at the time he used deadly force. Accordingly, we cannot say that this is the exceptional case in which the evidence weighs heavily against Bouie's conviction for felonious assault, and we overrule Bouie's first assignment of error.

### B. Jury Instructions

{¶ 40} In his second assignment of error, Bouie argues that the trial court erred by not instructing the jury on aggravated assault, an offense of an inferior degree to felonious assault.

{¶ 41} We initially note that Bouie did not request a jury instruction on aggravated assault at trial. Accordingly, Bouie has waived all but plain error. *State v. Edgerson*, 8th Dist. Cuyahoga No. 101283, 2015-Ohio-593, ¶ 15.

**{¶ 42}** Under Crim.R. 52(B), a plain error affecting a substantial right may be noticed by an appellate court even though it was not brought to the attention of the trial court. However, an error rises to the level of plain error only if, but for the error, the outcome of the proceedings would have been different. *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 61; *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *Long* at 97.

**{¶ 43}** Felonious assault is defined in R.C. 2903.11 as follows:

(A) No person shall knowingly:

(1) Cause serious physical harm to another;

(2) Cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code.

(B) Whoever violates this section is guilty of felonious assault, an aggravated felony of the second degree.

**{¶ 44}** Aggravated assault is defined in R.C. 2903.12 as follows:

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:

(1) Cause serious physical harm to another;

(2) Cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code.

(B) Whoever violates this section is guilty of aggravated assault, a felony of the fourth degree.

{¶ 45} As statutorily defined, the offense of aggravated assault is an *inferior* degree of felonious assault "since its elements are identical to those of felonious assault, except for the additional mitigating element of serious provocation." *State v. Deem*, 40 Ohio St.3d 205, 210-211, 533 N.E.2d 294 (1988). Put simply, the difference between the elements of aggravated and felonious assault is provocation involving sudden passion or fit of rage. *State v. McDuffie*, 8th Dist. Cuyahoga No. 100826, 2014-Ohio-4924, ¶ 22. "When a person inflicts physical harm on another as a result of severe provocation, the law views their criminal culpability less severely." *Id.*

{¶ 46} "A jury instruction should be given for an inferior offense, 'if under any reasonable view of the evidence, and when all of the evidence is construed in a light most favorable to the defendant, a reasonable jury could find that the defendant had established by a preponderance of the evidence the existence of one or both of the mitigating circumstances.'" *State v. Livingston*, 8th Dist. Cuyahoga No. 88714, 2007-Ohio-3664, ¶ 5, quoting *State v. Rhodes*, 63 Ohio St.3d 613, 617-618, 590 N.E.2d 261 (1992).

{¶ 47} Further, "it has been held that in most cases, jury instructions on both self-defense and serious provocation are inconsistent." *State v. Crim*, 8th Dist. Cuyahoga No. 82347, 2004-Ohio-2553, ¶ 14. This is because "[t]he mental states of fear as required for self-defense and rage as required for aggravated assault are incompatible." *State v. Smith*, 8th Dist. Cuyahoga No. 100204, 2014-Ohio-2057, ¶ 52.

{¶ 48} "[I]n a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury." *Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), at paragraph four of the syllabus. To warrant an instruction on aggravated assault, a defendant must show that he or she acted under serious provocation. *Id.* at ¶ 23-24. "'Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force.'" *Smith* at ¶ 43, quoting *State v. Horton*, 9th Dist. Summit No. 26407, 2013-Ohio-3902, ¶ 52. R.C. 2903.12 also states that a defendant must act "while under the influence of sudden passion or in a sudden fit of rage."

{¶ 49} In *State v. Mack*, 82 Ohio St.3d 198, 694 N.E.2d 1328 (1998), the Ohio Supreme Court reiterated that an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage, meaning that the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.* at 201. If this objective standard is met, then the inquiry shifts to a subjective standard to determine whether the defendant in the particular case "'actually was under the influence of sudden passion or in a sudden fit of rage.'" *Id.*, quoting *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992).

{¶ 50} Courts have found that an instruction on aggravated assault is not warranted when defendants fail to provide evidence that they acted while under the influence of sudden passion or in a sudden fit of rage. *Compare State v. Walker*, 2d

Dist. Montgomery No. 25741, 2014-Ohio-1287, ¶ 7 (appellant testified that he "was never angry" and only scared, so counsel was not deficient for failing to request instruction on aggravated assault); *Horton* at ¶ 53 (appellant only testified that he "feared for the safety of [another,]" which was not enough to warrant aggravated assault instruction); *Crim*, 8th Dist. Cuyahoga No. 82347, 2004-Ohio-2553, at ¶ 13-14 (because the appellant (1) failed to demonstrate that he was provoked by the victims' actions, (2) testified that he was not in a fit of rage, and (3) said he "was not angry and was cool, calm and collected" when he shot at the victims, the trial court did not err in failing to instruct the jury on aggravated assault) *with State v. Bostick*, 9th Dist. Summit No. 25853, 2012-Ohio-5048, ¶ 10-13 (appellant testified that he "flipped and saw red," which was evidence that the appellant was under the influence of sudden passion or a fit of rage); *State v. Smith*, 168 Ohio App.3d 141, 2006-Ohio-3720, 858 N.E.2d 1222, ¶ 55-57 (1st Dist.) (testimony showed that defendant "looked angry and upset" and indicated that defendant's anger "escalated into rage, terror, or furious hatred" so the trial court should have instructed the jury on aggravated assault as to one of the shootings that defendant allegedly committed).

{¶ 51} Further, "fear alone is not a basis for establishing the mitigating circumstances of aggravated assault." *Livingston*, 8th Dist. Cuyahoga No. 88714, 2007-Ohio-3664, at ¶ 11, citing *Mack*.

{¶ 52} At trial, the following exchange occurred during Bouie's testimony:

COUNSEL:          He shot first, right?

| BOUIE: | Yes, sir. |
|---|---|
| COUNSEL: | And the only reason you shot was what? Why did you shoot? |
| BOUIE: | Well, I shot because I had to defend myself and I was defending — I was defending myself and of course my kid's mother. |

{¶ 53} In other words, Bouie said he shot at Solomon to defend Howard and himself, not because he was in a rage or out of sudden passion. At best, his testimony shows he shot out of fear, which is not sufficient to warrant an aggravated assault instruction. *Livingston* at ¶ 11. Therefore, the facts of this case did not warrant an instruction on the inferior offense of aggravated assault because there was no evidence that Bouie was under a sudden passion or fit of rage.

{¶ 54} Accordingly, we overrule Bouie's second assignment of error.

**C. Ineffective Assistance of Counsel**

{¶ 55} In his third assignment of error, Bouie argues that his trial counsel was ineffective for failing to request an instruction for aggravated assault.

{¶ 56} The defendant carries the burden of establishing a claim of ineffective assistance of counsel on appeal. *State v. Corrothers*, 8th Dist. Cuyahoga No. 72064, 1998 Ohio App. LEXIS 491, 19 (Feb. 12, 1998), citing *State v. Smith*, 3 Ohio App.3d 115, 444 N.E.2d 85 (8th Dist.1981). To gain reversal on a claim of ineffective assistance of counsel, a defendant must show that (1) his "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The first prong of *Strickland*'s test requires the defendant to show "that

counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. *Strickland*'s second prong requires the defendant to show "a reasonable probability that but for counsel's errors, the proceeding's result would have been different." *State v. Winters*, 8th Dist. Cuyahoga No. 102871, 2016-Ohio-928, ¶ 25, citing *Strickland.*

{¶ 57} While "[t]he right to counsel is the right to the effective assistance of counsel," "trial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel." *Id.* at 686, citing *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *State v. Sanchez*, 8th Dist. Cuyahoga No. 103078, 2016-Ohio-3167, ¶ 26, citing *Strickland* and quoting *State v. Foster*, 8th Dist. Cuyahoga No. 93391, 2010-Ohio-3186. "Judicial scrutiny of defense counsel's performance must be highly deferential." *Sanchez* at ¶ 8, citing *Strickland.*

{¶ 58} "Failure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel." *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996). "Specifically, 'when a defendant puts on a defense of self-defense, an instruction on the inferior degree offense could have been perceived by the jury as contradictory to the self-defense theory' [and] 'it could confuse the jury to argue that the defendant acted in fear for his life but also was provoked and acted in a fit of rage.'" *State v. Mendoza*, 10th Dist. Franklin No. 16AP-893, 2017-Ohio-8977, ¶ 84, quoting *State v. Levonyak*, 7th Dist. Mahoning No. 05 MA 227, 2007-Ohio-5044. Therefore, "'it is a trial strategy for counsel to choose to go solely with the self-defense theory and not request an

inferior degree offense,' and 'trial strategies, even debatable ones, do not constitute ineffective assistance of counsel.'" *Id.*, quoting *Levonyak.*

{¶ 59} After review of the record, we find that Bouie failed to demonstrate that his counsel performed deficiently in not requesting an instruction on the inferior offense of aggravated assault. As we stated with respect to Bouie's second assignment of error, there was no evidence to show that Bouie acted in sudden passion or a fit of rage that would warrant such an instruction. In fact, the evidence showed, at best, that Bouie acted in fear of his life and to defend Howard and himself from Solomon's gunfire, which would support the self-defense instruction that his counsel requested and the trial court gave at trial. Therefore, his counsel's decision to not request an inferior-offense instruction that generally is held to be inconsistent with a self-defense instruction and that was not supported by the evidence does not constitute ineffective assistance of counsel, and we overrule Bouie's third assignment of error.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
LARRY A. JONES, SR., J., CONCUR